

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-3-1997

# Woodson v. Scott Paper Co

Precedential or Non-Precedential:

Docket 95-1758

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Woodson v. Scott Paper Co" (1997). *1997 Decisions.* Paper 75.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/75

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

NO. 95-1758
_____

JAMES W. WOODSON,

Appellee

v.

SCOTT PAPER CO.,

Appellant

_____

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civ. No. 93-cv-06076)
_____

Argued: May 15, 1996

Before:  BECKER, NYGAARD, and LEWIS, Circuit Judges.

(Filed  April 3, l997)

STEVEN R. WALL, ESQUIRE (ARGUED)
JULIE A. UEBLER, ESQUIRE
Morgan, Lewis & Bockius
2000 One Logan Square
Philadelphia, PA  19103

Attorneys for Appellant
Scott Paper Company

ALAN B. EPSTEIN, ESQUIRE (ARGUED)
Jablon, Epstein, Wolf & Drucker
The Bellevue, Ninth Floor
Broad and Walnut Streets
Philadelphia, PA  19102

Attorneys for Appellee
James W. Woodson

---

OPINION OF THE COURT

---

BECKER, Circuit Judge.

James W. Woodson, an African-American male, brought suit against Scott Paper Company claiming that he was a victim of unlawful racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Pennsylvania Human Relations Act, 43 Pa. C.S. § 951 et seq. The jury found for Scott on the discrimination claims, but for Woodson on the retaliation claims, and made a large damages award. This appeal by Scott from the denial of its post-trial motions presents three issues.

First, Scott contends that the evidence was insufficient as a matter of law to establish that Woodson was terminated in retaliation for filing discrimination charges with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC"). Some two years passed between the complaints and his termination. According to Scott, the jury could not have reasonably found a "causal link" between the complaints and Woodson's discharge because the evidence fails to support a pattern of antagonistic behavior by Scott that links the complaints and the termination, which we have required in cases in which the two events are temporally remote. Although the question is close and no piece of evidence alone is sufficient to support a causal link finding, we will reject Scott's contention that judgment as a matter of law was

improperly denied and affirm the denial of the Rule 50 motion in this respect because the evidence, when considered in its entirety, is sufficient to establish a causal link.

Scott's second contention is that, because no verified complaint was filed with the PHRC, judgment should be entered in its favor on Woodson's retaliation claim under the Pennsylvania Human Relations Act ("PHRA") and, concomitantly, that Woodson's verdict is subject to the $300,000 damages cap of Title VII, 42 U.S.C. § 1981a(b)(3). We agree. The worksharing agreement between the PHRC and the EEOC does not operate to satisfy the PHRA's filing requirement. Moreover, the district court erred in holding that Woodson was excused from the filing requirement under the doctrine of "equitable filing," even if we were to predict that the Pennsylvania Supreme Court would adopt such a doctrine. Hence we will reverse the district court's denial of Scott's Rule 50 motion in this respect and direct the district court to enter judgment in Scott's favor on Woodson's PHRA retaliation claim.

Finally, Scott appeals from the denial of its motion for a new trial under Fed. R. Civ. P. 59, and makes two separate claims of error in the jury instructions. First, it contends that the district court incorrectly instructed the jury that racist graffiti that appeared in a bathroom at Scott's Chester plant was "direct evidence" of Scott's unlawful motive. We conclude that the district court erred in charging the jury as such; the charge was misleading on several levels, and the graffiti incident can, at most, constitute circumstantial evidence of Scott's

3

retaliatory motive. Second, Scott contends that the district court erred in charging the jury that retaliation need only be a "motivating factor" in Woodson's discharge in order to find in Woodson's favor, and that the jury should have been instructed that retaliation must have had a "determinative effect" on the decision to fire Woodson. Because we hold that the "motivating factor" standard of § 107 of the Civil Rights Act of 1991 does not apply to retaliation claims, we necessarily conclude that the determinative effect standard, established in <u>Miller v. CIGNA Corp.</u>, 47 F.3d 586, 595 (3d Cir. 1995) (en banc), governs this case. Moreover, the jury charge errors were not harmless. For these reasons, we will affirm in part and reverse in part, and remand for a new trial on Woodson's retaliation claim.

## I. Facts and Procedural History

Woodson joined Scott in 1970 as a Chemical Material Specialist at the company's Philadelphia, Pennsylvania headquarters. Within six months, he was promoted to the position of Wet End Specialist. In 1973, Woodson received his second promotion (to Process Engineer) and was transferred to Scott's plant in Detroit. He remained in Detroit until 1978, having advanced to the position of Technical Director. After a brief return to Pennsylvania (this time to Scott's Chester plant), Woodson was promoted to Finishing Superintendent and relocated to Michigan.

In 1981, Woodson's wife unexpectedly died in surgery leaving him to raise a young son and nephew. He requested a transfer to the Philadelphia area in order to be closer to his family. In

1983, Scott found him a position in Chester, but it required a demotion to Paper Mill Technical Manager for the plant. Woodson accepted the position.

Woodson was successful at the Chester plant. In his 1986 performance evaluation, he received a ranking of "8" out of a possible 10 points from his supervisor, who praised his strengths as both a team player and a leader. Woodson was promoted to Technology Manager in 1987 and received a performance rating of "highly successful" in that position in 1987, 1988, and 1989. In 1989, he received an award for his involvement in an innovative plant project. He received raises in both 1989 and 1990.

Beginning in 1988, Woodson applied unsuccessfully for numerous product system leader positions. In November 1989, and again in February 1990, frustrated with Scott's failure to promote him, he filed charges of discrimination against Scott with both the EEOC and the PHRC, alleging that Scott had failed to promote him because of his race.

Scott maintains that Woodson was not promoted to product system leader in 1988 because he performed poorly in an interview for that position. In addition, Scott points out that Woodson's 1988 performance evaluation, prepared at the beginning of 1989, reported that he had "problems communicating with some peers and superiors diminishing his effectiveness. Does more telling than selling thereby creating conflict." Both Woodson and John Zohlman, Scott's Director of Human Resources for Manufacturing and Logistics, testified that, in May or June 1989, before Woodson filed his complaints, Zohlman suggested that Woodson

consult with a behavioral psychologist, Dr. Bell, to improve his working relationships.  Woodson's 1989 performance evaluation, prepared in 1990 after he had filed his first complaint, recommended that Woodson work with an outside consultant "to evaluate and improve perception by superiors."

In October 1990, Woodson was awarded one of the three open product system leader positions, in the Light Weight Wet Strength–Napkins division.  In this capacity, he reported to James Peiffer, the Chester Plant Manager.[1]  Peiffer testified that Woodson was awarded the napkin line position because "the napkins was a good fit for him," and Woodson testified that he was "probably the only person at Scott Paper who could turn napkins around."  Of the three divisions with open positions, the napkin line division was the smallest and worst performing.

Woodson testified that, after receiving this promotion, Zohlman called to congratulate him.  During the course of that conversation, Zohlman suggested that Woodson drop his administrative complaints: "[Zohlman] basically, in passing comment, suggested that okay, now that I was a product system leader, I ought to focus my attention in that direction toward– as opposed to the EEO suits and perhaps I should drop the suits."

Woodson claims that, as product system leader, he repeatedly requested more workers and more management support, but that these requests were denied until October 1991, just months before

---

[1]Peiffer reported to Thomas Czepiel and William Wadsworth, who participated in the "forced ranking" that led to Woodson's dismissal.

his discharge.  Woodson also continued to seek further promotions, but testified that he felt blocked.

In June or July 1991, during Woodson's tenure as product system leader, graffiti was spray-painted on the wall of a men's bathroom in the Chester plant.  That graffiti stated -- "Nigger, I'm going to get you," "Niggers are taking our jobs," and "Niggers who talk are Niggers who hang."  At the time, Woodson was the only new black management employee, and the only one who had "talked" -- i.e., filed a claim of discrimination.  Scott immediately hired a private investigator to explore the incident, and sent out a letter to employees condemning the graffiti.  Scott also formed a task force, which hired an outside consultant and prepared a survey of employees to explore the issues raised by the graffiti.  The parties, however, dispute the adequacy of Scott's response:  Diversity training was not implemented until after Woodson left Scott's employ, and Woodson testified that to his knowledge Scott took no action in response to the graffiti, other than the letter to employees.

In the fall of 1991, Scott initiated a reorganization and cost reduction program.  Pursuant to the plan, Scott implemented a "forced ranking" of all employees.  On November 19, 1991, Thomas Czepiel (Vice President for Manufacturing Operations), William Wadsworth (Vice President, Asset Optimization), and Edward Goldberg (Vice President of Manufacturing Development) met to evaluate twenty-seven managers -- both product system leaders and other managers with similar duties.  The ranking procedures were designed by Czepiel, Wadsworth, and Zohlman (though Zohlman

7

took no part in the actual evaluation).  After the evaluations, Woodson was ranked twenty-fifth even though his annual evaluations were better than or comparable to those of a number of managers ranked above him.  The bottom five individuals were selected for termination, and on January 27, 1992, Woodson was informed that he had lost his job.

Wadsworth and Goldberg admitted that they had little first-hand knowledge about Woodson's performance and did not review his personnel file in making their evaluations.  Both Wadsworth and Czepiel testified that they were aware at the time of the ranking that Woodson had filed discrimination charges.  Czepiel described in an affidavit the decision reached by the group:

Our decision that Mr. Woodson's job skills were less than satisfactory was based on our agreement that Mr. Woodson did not understand and had not adopted the philosophy of the AO organization because he refused to disassociate himself from a hierarchical individualistic management strategy, thus remaining an ineffectual team leader.  As a result Mr. Woodson had in our view isolated himself from the members of his product system team, stifled participation and coordination between and among those individuals and created a barrier to the development of the AO concept at the Chester plant.  In fact, Mr. Woodson was in my view borderline insubordinate in his rejection of the organization and cultural changes that Scott was trying to implement as part of the AO concept.  Messrs. Wadsworth, Goldberg and I were also aware of the disappointing performance of Mr. Woodson's product system since he assumed leadership of that system in October of 1990. (emphasis added)

As Czepiel described it at trial, the "AO concept" was an attempt at the plant to move away from hierarchical forms of organization to a system in which "people took greater accountability and initiative in doing their work."

The memorandum that outlined the downsizing process stated

8

that "[i]n developing these ratings, consideration should be given to 1990 and anticipated 1991 performance ratings.  Major discrepancies between job skill ratings and these performance ratings will need to be explained."  The discrepancy between Woodson's successful prior record of achievement and his poor ranking was not raised in the Corporate Review Committee -- a group charged with looking at the results of the forced ranking and overruling any incongruous termination decisions -- even though Zohlman testified that the memorandum meant that any discrepancies needed to be explained to the Corporate Review Committee.

According to Scott, 259 employees were terminated in the reorganization through this procedure.  Woodson, in response, claims that he and the only other African-American product system leader were the only two product system leaders terminated.

In November 1993, Woodson instituted the present action against Scott in the District Court for the Eastern District of Pennsylvania, alleging that he was a victim of unlawful racial discrimination and retaliation in violation of Title VII and the PHRA.  The case came up on trial in February 1995.  Before the case was submitted to the jury, Scott moved for judgment as a matter of law, Fed. R. Civ. P. 50(a), on two grounds: (1) Woodson's PHRA claim failed as a matter of law because, as he had admitted, no verified complaint was ever filed with the PHRC; and (2) insufficient record evidence existed from which a jury could conclude that Woodson was terminated in retaliation for filing discrimination charges two years before his termination.

The district court denied Scott's motion and submitted Woodson's case to the jury. The jury returned a verdict in Woodson's favor on the retaliation claims under Title VII and the PHRA and awarded him the stipulated amount of $150,000 in past earnings, $397,845 in future earnings, $10,000 for emotional distress, and $1,000,000 in punitive damages. The jury found for Scott on the discrimination claims, and that finding is not contested on appeal.

After the jury verdict, Scott renewed its motion for judgment as a matter of law, Fed. R. Civ. P. 50(b), reasserting the arguments made in its earlier motion. Scott also moved for a new trial, Fed. R. Civ. P. 59, based on what it believed to be erroneous and prejudicial jury instructions given by the district court. The court denied Scott's motions, Woodson v. Scott Paper Co., 898 F. Supp. 298 (E.D. Pa. 1995), and Scott now appeals on four separate grounds: (1) the district court erred in denying Scott's motion for judgment as a matter of law on Woodson's retaliation claims because the evidence was insufficient to show a causal link between Woodson's 1989 and 1990 discrimination complaints and his 1992 firing; (2) the district court erred in denying Scott's motion for judgment as a matter of law on Woodson's retaliation claim under the PHRA because Woodson failed to exhaust his administrative remedies under the Act; (3) the district court should have granted Scott's motion for a new trial because it improperly instructed the jury that the racial graffiti that appeared in the bathroom of the Chester plant was "direct" evidence of Scott's unlawful motive; and (4) the

district court should have granted Scott's motion for a new trial because it incorrectly instructed the jury that retaliation need only be a "motivating factor" for the termination in order to find for Woodson instead of charging that retaliation must have had a "determinative effect" on the decision.

The district court exercised jurisdiction under 28 U.S.C. §§ 1331 and 1367(a), and we have appellate jurisdiction over the final order under 28 U.S.C. § 1291. We exercise plenary review over Scott's first two claims. Lightning Lube, Inc. v. Witco Corp, 4 F.3d 1153, 1166 (3d Cir. 1993). A motion for judgment as a matter of law "should be granted only if viewing all the evidence which has been tendered and should have been admitted in the light most favorable to party opposing the motion, no jury could decide in that party's favor." Watters v. City of Philadelphia, 55 F.3d 886, 891 (3d Cir. 1995) (citation and internal quotation marks omitted).

**I.    I.  Sufficiency of Evidence Supporting Woodson's Retaliation                                                           Claim**

**A.   Introduction**

Section 704(a) of Title VII forbids an employer from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation . . . under this subchapter." 42 U.S.C. § 2000e–3(a). It is similarly unlawful under § 5(d) of the PHRA for an employer "to discriminate in any manner against any individual because such individual has opposed

11

any practice forbidden by this act, or because such individual has made a charge . . . under this act."  43 Pa. C.S. § 955(d).

The allocation of the burden of proof for both the federal and state retaliation claims follows the familiar Title VII standards.  Griffiths, 988 F.2d at 468; Waddell v. Small Tube Products, Inc., 799 F.2d 69, 73 (3d Cir. 1986).  These standards will vary depending on whether the suit is characterized as a "pretext" suit or a "mixed motives" suit.  For Woodson's retaliation claim, which has proceeded under a "pretext" theory, the standards have been laid out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981), and St. Mary's Honor Center v. Hicks, 113 S. Ct. 2742 (1993).

The plaintiff first must establish a prima facie case of retaliation: he must show that (1) he was engaged in protected activity; (2) he was discharged subsequent to or contemporaneously with such activity; and (3) there is a causal link between the protected activity and the discharge.  Quiroga v. Hasbro, Inc., 934 F.2d 497, 501 (3d Cir. 1991); Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989).[2]  The issue here

_____

[2]If the plaintiff succeeds, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its actions.  McDonnell Douglas, 411 U.S. at 802; Burdine, 450 U.S. at 252–55; Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).  The defendant's burden at this stage is relatively light: it is satisfied if the defendant articulates any legitimate reason for the discharge; the defendant need not prove that the articulated reason actually motivated the discharge.  Fuentes, 32 F.3d at 763.  At this point, the presumption of discrimination drops from the case.  Id.  To prevail at trial, the plaintiff must convince the factfinder "both that the reason was false, and that discrimination was the real reason."  Hicks, 113 S. Ct. at 2748;

12

concerns whether Woodson has presented sufficient evidence from which a jury could reasonably find a prima facie case of retaliation.

Scott concedes that the evidence presented at trial was sufficient to satisfy two of the three components of the prima facie case: Woodson engaged in protected activity -- the filing of race discrimination charges with the EEOC and the PHRC -- and he was discharged after he engaged in that activity. Scott contends, however, that the record is devoid of evidence from which a reasonable jury could find the requisite causal link between the protected activity and his eventual discharge.

Our cases have established that temporal proximity between the protected activity and the termination is sufficient to establish a causal link. See, e.g., Jalil, 873 F.2d at 708. We have also held that the "mere passage of time is not legally conclusive proof against retaliation." Robinson v. SEPTA, 982 F.2d 892, 894 (3d Cir. 1993); see also Kachmar v. SunGard Data Systems, Inc., ___ F.3d ___, 1997 WL 135897 (3d Cir. 1997); Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1085 (3d Cir. 1996). In the Robinson case, almost two years passed between the protected activity and Robinson's discharge. However, the district court found that SEPTA had subjected Robinson to a

---

see also id. at 2754 ("It is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination."). This burden may be met in a variety of ways. See Fuentes, 32 F.3d at 764-65; Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061 (3d Cir. 1996) (en banc). In the end, the burden of proof remains with the plaintiff.

pattern of harassment during that time period. We therefore held that there was sufficient evidence supporting a causal link: "The temporal proximity noted in other cases is missing here and we might be hard pressed to uphold the trial judge's finding were it not for the intervening pattern of antagonism that SEPTA demonstrated." Robinson, 982 F.2d at 895; see also id. ("The court could reasonably find that the initial series of events thus caused Robinson's and SEPTA's relationship to deteriorate, and set a pattern of behavior that SEPTA followed in retaliating against Robinson's later efforts at opposing the Title VII violations he perceived."). Thus, a plaintiff can establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period.[3]

Scott correctly points out that the protected activity Woodson engaged in--filing complaints with the PHRC and EEOC in November 1989 and February 1990--is temporally remote from Woodson's termination in January 1992. Thus, the argument continues, Woodson can prevail only if a reasonable jury could find that Scott engaged in a "pattern of antagonism" in the period between his administrative complaints and his firing. Scott contends that, even viewing the evidence in the light most favorable to Woodson, the evidence does not support a finding of

---

[3]Because we conclude that the evidence is sufficient to establish a pattern of antagonistic behavior linking the discrimination complaints and Woodson's discharge, we need not consider whether other types of evidence might also support a causal link finding in the absence of temporal proximity.

14

a pattern of antagonistic behavior against Woodson that would allow Woodson to prevail on the causal link prong. Rather, according to Scott, the evidence points only to the conclusion that Woodson was terminated in a company-wide cost reduction program nearly two years after he filed his discrimination complaints and after Scott had already promoted him to the position he sought when he filed those complaints. Under such circumstances, Scott submits, no reasonable jury could find a causal link between Woodson's discrimination complaints and his discharge.

Woodson, in response, contends that the evidence is clearly sufficient to support a finding by a reasonable jury that between February 1990, when he filed the second of his administrative complaints, and his termination in 1992, Scott engaged in a pattern of retaliation against him. This pattern is said to include Scott's "setting Woodson up to fail" by hiring him as a product system leader in the poorly performing napkin division and then refusing to provide him with adequate resources; Scott's failure to respond appropriately to racist graffiti in its plant; and Scott's termination of Woodson pursuant to a "sham" ranking process performed by individuals who were not familiar with his employment record, but only with his charges of discrimination.

For the reasons that follow, we agree with Woodson that, viewing the evidence in the light most favorable to him, the district court did not err in finding the evidence sufficient to support a causal link between Woodson's administrative complaints and his discharge. While each piece of evidence alone is not

15

sufficient to support an inference of a pattern of antagonistic behavior, taken together the evidence is sufficient.  Thus, while we will discuss each piece of evidence, and Scott's objections to them, in turn, we must determine whether the evidence is sufficient based on the whole picture.  Cf. Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir. 1990) ("A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario.").  We also keep in mind, recognizing that much of the record is comprised of trial testimony, that the jury had "the unique opportunity to judge the credibility and demeanor" of the witnesses who testified at the trial, and that it reached its conclusions based in part on those observations.  Quiroga, 934 F.2d at 502.

**B.    Evidentiary Review and Analysis**

After Woodson had filed his first administrative complaint, he received his 1989 performance evaluation which suggested that he work with an outside consultant to improve his "perception by superiors."  The district court apparently believed that "this recommendation, appearing in a formal written evaluation, was a response to his perception of racial animus among his superiors." 898 F. Supp. at 303.  Scott objects to the district court's reliance on this recommendation because Zohlman, the human resources director, had suggested in a conversation with Woodson in May or June 1989, before Woodson had filed his first complaint, that he consult a behavioral psychologist to improve

16

his working relationships. Thus, according to Scott, the recommendation in the performance evaluation is not probative of retaliatory animus because the same recommendation was made to Woodson before he filed the discrimination complaint. While Woodson acknowledged that the conversation with Zohlman took place, and Scott's argument has considerable force, it is not conclusive, as it is clear to us that a jury could rely on the written performance evaluation to find a pattern of antagonism. More specifically, the jury was entitled to conclude (if it wished) that the recommendation was made "official" when it was included in the written evaluation, which was used to determine promotions and salary, and that this was done in response to Woodson's complaints to the PHRC and EEOC.

Woodson also points to the fact that, soon after he was promoted, Zohlman suggested, during the course of a "congratulatory" phone call, that Woodson drop the administrative complaints against Scott. Woodson refused to do so. Pointing out that Zohlman did not participate in Woodson's ranking, Scott contends that this statement is irrelevant as a matter of law because it was a stray remark made by a non-decisionmaker. The record at trial, however, showed that Zohlman designed the ranking procedures and presented the results of the forced ranking, along with Wadsworth, to the Corporate Review Committee. He participated in the process through which Woodson was fired to such an extent that we cannot say that he was "outside the chain of decisionmakers who had the authority to hire and fire plaintiff," Gomez v. Allegheny Health Serv., Inc., 71 F.3d 1079,

17

1085 (3d Cir. 1995), cert. denied, 116 S. Ct. 2524 (1996), which is our standard for determining whether statements are "stray remarks." But even if Zohlman's statement was a mere stray remark, it can constitute evidence of the atmosphere in which the forced ranking was carried out, and would, therefore, be relevant to the question whether Scott retaliated against Woodson after he filed his discrimination complaints. See Antol v. Perry, 82 F.3d 1291, 1302 (3d Cir. 1996).[4]

The district court also noted that "[w]hen plaintiff was eventually promoted in 1990, after a number of requests, it was to lead the poorest performing division. He was paid at a lower level than similarly situated colleagues and denied adequate staffing and management support." 898 F. Supp. at 303 (citations omitted). We acknowledge that management has the clear right to assign its employees to positions where they can contribute most effectively to the firm's profitability, but we must agree with the district court that Woodson's assignment to this division, and the treatment just described, could at least support an inference by the jury that Scott responded to his discrimination complaints by granting him a promotion, but setting him up to fail in his new position.[5]

---

[4]The same is true with respect to James Peiffer, Woodson's direct supervisor. Scott contends that evidence involving Peiffer, which we will discuss below, is irrelevant as a matter of law to this case because it points at most to Peiffer's retaliatory animus, and Peiffer was not involved in the ranking process through which Woodson was fired. We reject this contention for the reasons explained in the text.

[5]Scott contends that these are unsupported factual allegations because the district court cited to exhibits that were not admitted into evidence at trial (although they were

18

We have held that "an atmosphere of condoned [racial] harassment in a workplace increases the likelihood of retaliation for complaints in individual cases." Glass v. Philadelphia Elec. Co., 34 F.3d 188, 195 (3d Cir. 1994) (internal quotation marks omitted); Aman, 85 F.3d at 1086. In other words, evidence of condoned harassment can support an inference by the fact-finder that the employee, having failed to respond to the harassment, also engaged in retaliatory conduct against the plaintiff. This precept is germane in view of the testimony that, in June or July of 1991, racist graffiti appeared on the wall of the men's bathroom in the Chester plant, coupled with Woodson's evidence that the company's response to the incident was inadequate. The jury was entitled to consider these factors when deciding whether Woodson's termination was in retaliation for his complaints. Later that year, Woodson applied for an important promotion, which he did not receive. While this may not prove much by itself, in conjunction with the other facts it could have been taken into account by the jury in finding a pattern of antagonism.

premarked as exhibits and used during the cross-examination of Robert Desisto). Even if these exhibits were not before the jury, however, there was ample testimony that supports the same inference. Woodson testified about the problems with staffing in his division as well as the fact that the division was a poor performer. Czepiel testified that it "was the weakest product system . . . that we had in the company." Moreover, Robert Desisto, who was ultimately assigned to Woodson's division in October 1991, testified on cross-examination about the exhibits that the district court cited. Even though they were not admitted, the contents of those exhibits -- Woodson's repeated requests for more staff as well as his belief that he was being set up for failure -- were discussed during the course of the testimony, and were, therefore, before the jury.

Testimony about the process by which Woodson was fired also was probative of a causal link between his discrimination complaints and his termination. First, two of the three company officials who ranked the product system leader work group, Wadsworth and Czepiel, admitted that they were aware that Woodson had filed discrimination complaints when they ranked him.[6] Second, Zohlman and Peiffer were also aware of Woodson's discrimination charges when the ranking was carried out. Although neither participated directly in the ranking process, Zohlman designed the process and provided human relations support to the rankers and Peiffer was Woodson's direct supervisor at the Chester plant.[7] As we explained above, even if they were not directly evaluating Woodson in the process, their testimony is probative of the environment in which the employment decision was made.

Moreover, two of the evaluators, Wadsworth and Goldberg, admitted that they had little first-hand knowledge of Woodson's past performance record and that they did not review his personnel file in making their evaluations. Hence, they were

---

[6] Scott challenges the district court's reliance on this testimony on the ground that knowledge of the discrimination complaints by the decisionmakers cannot in and of itself support an inference of retaliation. While that is correct, decisionmakers' knowledge, taken together with other evidence, can support such an inference.

[7] The district court erred in suggesting that Peiffer and Zohlman "discussed these rankings with the evaluators during the ranking process." 898 F. Supp. at 303. At least, we have found no support for this statement in the record, nor has Woodson pointed us to any. Nevertheless, the jury was entitled to consider Peiffer's and Zohlman's testimony that they knew of the discrimination charges.

unaware of Woodson's consistently high performance reviews during his tenure at the Chester plant. Such testimony would provide support for Woodson's contention that the ranking process was a "sham," as he was evaluated by managers who knew of the discrimination complaints but not of his past performance at the plant. The third evaluator, Czepiel, stated in his affidavit that he considered Woodson a "borderline insubordinate" in his rejection of certain cultural changes that Scott was trying to implement. The district court noted that the jury may have concluded that what Woodson's superiors considered to be the "ultimate act of insubordination" was his filing of administrative (discrimination) charges. 898 F. Supp. at 304. We believe that the jury could have reasonably drawn such an inference.

In addition, the discrepancies between Woodson's ranking and his past performance evaluations were not presented to the Corporate Review Committee, as they should have been under the reorganization plan. Scott contends that this is not probative of a causal link because all of the employees who were evaluated during the reorganization were subjected to the same process—their performance evaluations were not considered by either the initial evaluators or the Corporate Review Committee. Woodson, however, need not have been treated differently during the reorganization process for the jury to conclude that a causal link existed between his complaints and his termination. Under the facts described above, the decision to terminate Woodson may have been related to his discrimination complaints even if there

was no disparate treatment with respect to the process by which he was fired.

Finally, a confidential "work shedding" memorandum, which was prepared by Peiffer, recommended eliminating Woodson's job, but predicted that "an emotional reaction from [Woodson] could result in an age/race discrimination claim." The record shows that the "work shedding" process, in which the plant managers were involved, was part of the overall reorganization effort, but was unrelated to the ranking carried out by Wadsworth, Czepiel, and Goldberg. This memorandum was drafted on December 17, 1991, and was provided to the evaluation team and to Zohlman after the ranking was completed, but before the recommendations were presented to the Corporate Review Committee.[8] Scott, therefore, contends that this memo is not probative of retaliation because there is no evidence that actually links the memo to the decision to fire Woodson.

Although there was no testimony at trial that this memorandum actually affected the decision to fire Woodson, it too would have been probative of the environment in which the employment decision was made. It also suggests that Woodson's superiors were keenly aware of the discrimination complaints that Woodson had lodged against the company. The jury could have drawn many conclusions from this evidence, but we agree with the district court that "[t]hese predictions could reasonably have

---

[8]The district court's comment that this memorandum was provided to the assessment team prior to the "final" decision about Woodson's job is technically correct.

22

been interpreted by the jury as warnings based on the previously filed discrimination charges--warnings that went unheeded." Id. at 303.

Although the question is very close, we conclude that the evidence presented at trial, when viewed in the light most favorable to Woodson, is sufficient to support a causal link between Woodson's discrimination complaints and his termination. The jury might reasonably have concluded that Scott engaged in a pattern of antagonistic behavior against Woodson after his complaints, setting him up to fail in a poorly performing division and then terminating him through a "sham" ranking procedure. Although none of the pieces of evidence that we have discussed, standing alone, would be sufficient to allow this inference (especially the "environment" evidence), the evidence as a whole can be so, particularly when we consider, as we must, that the verdict may have been based in part on the jurors' evaluation of each witness' credibility and demeanor.

### III. Pennsylvania Human Relations Act Claim

#### A. Introduction

We turn next to Scott's argument that the district court erred in not entering judgment in Scott's favor on Woodson's retaliation claim under the PHRA.[9] According to Scott, Woodson

---

[9] We reject Woodson's contention that Scott waived this defense. Although Scott never pleaded this issue as an affirmative defense, it denied in its answer Woodson's allegation that he had exhausted his administrative remedies. Answer ¶ 6. Moreover, Scott made the same argument in its summary judgment motion, in its final pre-trial memorandum, and at trial, and also asked relevant questions in its request for admissions. This was enough to preserve the defense. We have held that the failure to assert an affirmative defense in an answer will not result in

23

failed to initiate administrative proceedings as required under the PHRA because no verified complaint was filed with the PHRC, and Woodson has admitted as much. If Scott is successful here and the PHRA claim must be dismissed, Woodson can proceed only under Title VII. In such event, the verdict, with a few exceptions, would be subject to the $300,000 damages cap of Title VII, 42 U.S.C. § 1981a(b)(3), and hence Woodson's damage recovery would be reduced significantly.[10] If Scott is wrong, Woodson can proceed under the PHRA and can recover the full amount of the jury verdict.

To bring suit under the PHRA, a plaintiff must first have filed an administrative complaint with the PHRC within 180 days of the alleged act of discrimination. 43 Pa. C.S. §§ 959(a), 962. If a plaintiff fails to file a timely complaint with the PHRC, then he or she is precluded from judicial remedies under the PHRA. The Pennsylvania courts have strictly interpreted this

_____

waiver if the opposing party has notice of the defense sufficient to avoid prejudice. See Charpentier v. Godsil, 937 F.2d 859, 864 (3d Cir. 1991) ("It has been held that a defendant does not waive an affirmative defense if he raised the issue at a pragmatically sufficient time, and [the plaintiff] was not prejudiced in its ability to respond." (internal quotations omitted)). For example, in Franklin Life Insurance Co. v. Bieniek, 312 F.2d 365, 371–72 (3d Cir. 1962), we found that the defendants' fraud defense had not been waived, even though it was not pleaded, because the defendants had raised the issue in their answer and pre-trial statement.

[10]Section 1981a(b)(2) expressly excludes "backpay, interest on backpay, or any other type of relief authorized under section 706(g) of the Civil Rights Act of 1964" from the definition of compensatory damages. While backpay would clearly be excluded from the cap, it is not clear whether future earnings would be as well, but we need not decide that here. The district court must do so on remand.

24

requirement, and have repeatedly held that "persons with claims that are cognizable under the Human Relations Act must avail themselves of the administrative process of the Commission or be barred from the judicial remedies authorized in Section 12(c) of the Act." Vincent v. Fuller Co., 616 A.2d 969, 974 (Pa. 1992); see also Fye v. Central Transp. Inc., 409 A.2d 2 (Pa. 1979); Clay v. Advanced Computer Applications, Inc., 559 A.2d 917 (Pa. 1989); Richardson v. Miller, 446 F.2d 1247, 1248 (3d Cir. 1971) ("Since plaintiff failed to file a charge with the respective Commissions within the appropriate time periods, he is now foreclosed from pursuing the remedies provided by the Acts.").

As the Pennsylvania Supreme Court has explained, the Pennsylvania legislature, recognizing the "invidiousness and the pervasiveness of the practice of discrimination," created with the PHRA "a procedure and an agency specially designed and equipped to attack this persisting problem and to provide relief to citizens who have been unjustly injured thereby." Fye, 409 A.2d at 4. Strictly interpreting the filing requirement of the PHRA allows the PHRC to use its specialized expertise to attempt to resolve discrimination claims without the parties resorting to court.

On July 22, 1992, Woodson filed an administrative charge with the EEOC alleging the facts supporting the claim now on appeal. Such filing is a prerequisite for suing on his Title VII claim, 42 U.S.C. 2000e-5. Woodson, however, did not check the box on the EEOC charge form indicating that the charge should be filed with both agencies. Moreover, he signed an acknowledgment

25

on the same day that "I have received a letter advising me of my right to file a complaint under the Pennsylvania Human Relations Act. I am aware that I must file with PHRC within 30 days, or else I will lose those rights to relief under state law safeguarded by filing under the [PHRA]." Yet Woodson did not file a complaint with the PHRC, and admitted in response to Scott's request for admissions that the EEOC complaint was never cross-filed by the EEOC with the PHRC.[11]

Although Woodson never filed a complaint with the PHRC, and the complaint was never cross-filed with the PHRC, he nonetheless maintains that he may bring suit under the PHRA. First, he contends that, pursuant to the worksharing agreement entered into by the PHRC and the EEOC, Woodson's claim was "deemed" filed with the PHRC when he filed his charge with the EEOC. Second, he argues that, even if the claim was never filed with the PHRC, he should still be able to proceed with his PHRA retaliation claim because of representations made by the EEOC to him that it would file his claim with the PHRC. In this respect, Woodson urges us to affirm the reasoning of the district court, which permitted Woodson to recover for retaliation under the PHRA because the "EEOC's notice to the plaintiff should be considered an equitable filing." 898 F. Supp. at 302. We consider each of Woodson's contentions in turn.

---

[11]The request for admission stated: "James W. Woodson did not file a charge of discrimination with the PHRC based on the acts alleged in EEOC Charge Number 170921474, and Mr. Woodson's EEOC Charge Number 170921474 was not cross-filed with the PHRC." A92 (Request for Admission No. 16).

**B.    Effect of the Worksharing Agreement**

Turning first to Woodson's worksharing agreement argument, the PHRC and the EEOC have entered into an agreement through which they have apportioned initial jurisdiction over discrimination complaints in order to avoid unnecessary duplication of investigatory time and effort.  Under this agreement, each agency waives its right to initially review claims that are first filed with the other agency.  Woodson contends that, pursuant to this worksharing agreement, his charge was "automatically and simultaneously deemed filed" with the PHRC as soon as it was filed with the EEOC.

We agree with Scott, however, that the agreement between the EEOC and the PHRC is relevant only to the issue of whether a plaintiff has satisfied the administrative exhaustion requirements of the federal anti-discrimination statutes.  That is because federal courts lack jurisdiction to hear a Title VII claim, unless the plaintiff has filed a charge with the EEOC.  Alexander v. Gardner-Denver Co., 415 U.S. 36, 47 (1974).  A claimant cannot file a charge with the EEOC in a state, such as Pennsylvania, that provides an administrative remedy for employment discrimination, unless the charge has been filed first with the appropriate state agency and either (1) 60 days have elapsed; or (2) the state agency has terminated its proceedings.  42 U.S.C. § 2000e-5(c).

Under the worksharing agreement, a claim that is filed first with the EEOC can be processed by the EEOC, without being investigated as an initial matter by the PHRC.  Through this

worksharing agreement, therefore, Pennsylvania has waived its statutory right to initially process discrimination claims, and hence this agreement operates to "terminate" the PHRC proceedings with respect to those complaints that are filed first with the EEOC. Trevino-Barton v. Pittsburgh Nat'l Bank, 919 F.2d 874, 879 (3d Cir. 1990) (Title VII claim); see also EEOC v. Commercial Office Products Co., 486 U.S. 107 (1988); Kaimovitz v. Board of Trustees of the University of Illinois, 951 F.2d 765 (7th Cir. 1991) (ADEA claim). In other words, the worksharing agreement allows a plaintiff to proceed in court under Title VII without first filing with the PHRC.[12]

That, however, does not mean that a plaintiff can initiate PHRC proceedings as required by the PHRA merely by filing with

---

[12]The worksharing agreement clearly divides responsibility for processing claims that have been dual-filed with both the EEOC and the PHRC. That is, if Woodson had filed with the EEOC and indicated that he wished to cross-file with the PHRC, the worksharing agreement would have governed the processing of his claim. But the Pennsylvania courts have ruled that, if the EEOC transmits the claim to the PHRC, the filing requirement of the PHRA has been satisfied. The Pennsylvania Superior Court has held that the verified complaint filing requirement of the PHRA is satisfied if the EEOC actually transmits the EEOC charge to the PHRC. See Lukus v. Westinghouse Elec. Corp., 419 A.2d 431 (Pa. Super. 1980). In that case, the Superior Court noted that the EEOC charge satisfied the pleading requirements of 43 Pa. C.S. § 959, and moreover, that the PHRC treated the EEOC charge as capable of triggering PHRC action since it notified the EEOC that it was terminating its investigation of plaintiff's complaint. Id. at 452-53. The Pennsylvania Supreme Court has cited Lukus, in dicta, for the proposition that the PHRA filing requirement is satisfied if the EEOC forwards a charge to the PHRC. Vincent v. Fuller Co., 616 A.2d 969, 971 (Pa. 1992). In this regard, we note that Woodson's case would be quite different if he had marked the box for the EEOC to cross-file and the EEOC had failed to transmit the charge because of a breakdown in the administrative system. As that case is not before us, however, we do not decide it here.

28

the EEOC.[13]  Whether a plaintiff has initiated PHRC proceedings under the PHRA is a state law issue.  The worksharing agreement says nothing about whether a plaintiff has invoked PHRC procedures if the PHRC has never received his or her claim, nor could it, given that the Pennsylvania Supreme Court held in Fye v. Central Transportation Inc., 409 A.2d 2 (Pa. 1979), that EEOC procedures are not a sufficient surrogate for PHRC remedies.

In the Fye case, the plaintiff had initially filed a complaint with the PHRC, but had requested that the PHRC terminate its investigation and defer to pending EEOC proceedings regarding the same conduct.[14]  The plaintiff sought equitable

_____

[13]As Woodson points out, cases from other circuits have suggested that, under worksharing agreements between the EEOC and other state agencies, filing with the EEOC can operate to initiate proceedings in the state agency.  See, e.g., EEOC v. Green, 76 F.3d 19 (1st Cir. 1996); Griffin v. City of Dallas, 26 F.3d 610, 612-13 (5th Cir. 1994) (holding that, under the terms of the agreement between the EEOC and the Texas state agency, the filing of a charge with the EEOC instituted state proceedings within the meaning of § 706(e)(1) of the Civil Rights Act); Hong v. Children's Memorial Hosp., 936 F.2d 967, 970-71 (7th Cir. 1991) (holding that "workshare agreement can alone effect both initiation and termination of state proceedings and that, as a result, plaintiffs may file with the EEOC without first filing with the [state agency]").  In these cases, however, the issue was whether the claimant had properly satisfied the exhaustion requirements of Title VII, not whether a worksharing agreement can operate to initiate state proceedings such that the requirements of the state anti-discrimination laws can be satisfied.  For example, in Green, the issue was whether the claimant had initiated proceedings with the state agency such that she had up to 300 days after the allegedly discriminatory act, rather than 180 days, to file a charge with the EEOC under § 706(e)(1) of Title VII.

[14]Woodson suggests that Fye should not guide our inquiry because it was decided before the "applicable and controlling" worksharing agreement was entered into.  Woodson, however, does not make any contention that the worksharing agreement in effect when Fye was decided was any different from the agreement at issue in this case, nor is there any support in the record for such a contention.  Moreover, whether Woodson has exhausted his

relief for gender discrimination, and the question was whether her initial resort to the administrative procedures of the PHRA without exhausting them precluded filing suit. The plaintiff contended that "since the role of the agency was carried out, albeit not by the designated agency but by the Equal Opportunity Employment Commission, we should recognize substantial compliance with the statutory scheme and allow the court of common pleas to take jurisdiction under the circumstances." Id. at 5.

The Pennsylvania Supreme Court rejected this argument on the ground that the statute clearly required that she exhaust state administrative procedures before filing suit: "If the General Assembly wished to permit the substitution of agencies in its legislative scheme, it could easily have provided for that result. It declined to do so and it is beyond our powers to ignore that judgment absent some showing of a constitutional infringement." Id. Although Fye is not directly on point--it deals with whether a completed EEOC investigation can substitute for full resort to PHRC procedures--we predict that the Pennsylvania Supreme Court would hold that filing with the EEOC does not function as a filing for PHRA purposes. See also Clay, 559 A.2d at 919 ("The use by the legislature of the word 'shall,' as opposed to 'may,' expresses an intent to make administrative procedures under the PHRA a mandatory rather than discretionary means of enforcing the right created thereby.").

Thus, evidence of the worksharing agreement alone cannot

_____

PHRA remedies is a question of state law, and is not controlled by the worksharing agreement.

30

serve to show that Woodson invoked the Pennsylvania state administrative remedy as required by the PHRA.[15]  This holding is consistent with the result reached by the district courts of this Circuit that have considered this issue.  See, e.g., Parsons v. City of Philadelphia, 833 F. Supp. 1108, 1114 (E.D. Pa. 1993).  As a general matter, therefore, if the PHRC does not receive a complainant's claim, then that complainant cannot bring suit under the PHRA.

## C.    Equitable Filing

Woodson has admitted that the PHRC never actually received his complaint.  This case is complicated, however, by the fact that there is evidence of a letter from the EEOC to him that states: "You should be aware that the Commission will provide a copy of your charge to the below listed agency in accordance with

---

[15]We note that Kedra v. Nazareth Hospital, 857 F. Supp. 430 (E.D. Pa. 1994), on which Woodson relies, is not to the contrary.  In that case, the plaintiff filed a discrimination charge with the Philadelphia Commission on Human Relations (PhilaCHR), and the EEOC was informed of the claim pursuant to a worksharing agreement between the PhilaCHR and the EEOC.  Kedra did not, however, file a complaint with the PHRC.  The question there was whether "filing a charge with the Philadelphia Commission on Human Relations is tantamount to a filing with the Pennsylvania Human Relations Commission."  Id. at 432.  The court predicted that the Pennsylvania Supreme Court would hold that filing with the PhilaCHR constitutes compliance with the PHRA because of the PhilaCHR's statutory obligation to notify the PHRC of the complaints filed with it.  In so holding, the court explicitly noted that it did not reach the plaintiff's contention that the worksharing agreement between the EEOC and the PHRC operated to satisfy the administrative exhaustion requirement of the PHRA. In fact, that court acknowledged the Fye statement that the Pennsylvania legislature could have provided for the substitution of agencies if it so wished, and distinguished a filing with the EEOC from a filing with the PhilaCHR because "the Pennsylvania General Assembly explicitly contemplated that complainants could file with local commissions and that the local commissions would, in turn, notify Pa.HRC of those filings."  Id. at 433 n.6.

our procedures."  The PHRC is the agency listed at the bottom of the paragraph.  This letter is dated July 29, 1992, one week after Woodson signed the acknowledgment that he must file with the PHRC or lose any available state remedies.  We must, then, reach Woodson's second contention, that even if the worksharing agreement does not permit a complainant to satisfy the filing requirement of the PHRA by filing a claim with the EEOC only, Woodson is entitled to recover under his PHRA claim in this case because of these representations made by the EEOC.  To reach this issue, we must make two separate predictions about Pennsylvania law: first, whether the Pennsylvania Supreme Court would hold that the PHRA filing requirement could be satisfied based on some notion of "equitable filing," and second, even if it would, whether that court would allow Woodson to proceed under the PHRA based on this theory.

It is not clear whether the Pennsylvania Supreme Court would adopt an equitable filing doctrine.  As we explained above, the Pennsylvania Supreme Court has strictly enforced the PHRA filing requirement in many cases.  In predicting that the Pennsylvania Supreme Court would adopt an equitable filing doctrine, the district court failed to recognize this.  The district court only noted language from the PHRA that the "provisions of this act shall be construed liberally for the accomplishment of the purposes thereof."  43 Pa. C.S. 962(a).  The court cited, but ultimately chose to ignore, language from <u>Fye</u>, in which the Pennsylvania Supreme Court cautioned that a "liberal construction for the accomplishment of the purposes of the act is not

synonymous with a relaxation of the rule of exclusivity for the benefit of a complainant." Fye, 409 A.2d at 5.

We conclude that the district court erred in failing to give enough weight to Fye and the other Pennsylvania Supreme Court cases that have strictly adhered to the filing requirement of the PHRA. We are not, however, convinced that the Pennsylvania Supreme Court would refuse to apply equitable principles to excuse from the PHRA filing requirement a plaintiff who has been informed by the EEOC that the EEOC will forward a copy of the charge to the PHRC and who relies on that representation in not filing directly with the PHRC. This is particularly so because the Pennsylvania Supreme Court has suggested that the PHRA is in fact satisfied if the EEOC forwards the charge to the PHRC. See supra note 12. The question is close, with significant arguments on both sides that we detail in the margin.[16]

[16]Scott maintains that the Pennsylvania Supreme Court cases are clear that the PHRA exhaustion requirement is a strict one and that only the Pennsylvania legislature can amend the PHRA to introduce equitable principles into the filing requirement. In fact, the Pennsylvania General Assembly recently amended the PHRA to permit the application of equitable principles with respect to the time requirements for filing a complaint. The PHRA now provides that the "time limits for filing under any complaint or other pleading under this act shall be subject to waiver, estoppel and equitable tolling." 43 Pa. C.S. § 962(e). Scott contends that the legislature could have extended equitable principles to cases in which a plaintiff has not filed with the PHRC, but it chose not to.

On the other hand, Woodson points out that in no case in which the PHRA filing requirement has been strictly enforced has the EEOC represented to the plaintiff that it would file the complaint with the PHRC. Moreover, the district court relied on several cases in which courts have applied equitable notions to excuse the failure of the plaintiff to comply with the administrative exhaustion requirement. For example, in Hicks v. ABT Assoc., Inc., 572 F.2d 960 (3d Cir. 1978), this Court permitted a plaintiff to proceed under Title VII where the plaintiff's failure to file a charge resulted from the EEOC's

Fortunately, however, we need not reach that issue, as it is clear to us that Woodson would not be entitled to proceed under the PHRA even if the Pennsylvania Supreme Court would permit the application of equitable principles.  That is because there is no evidence that would support Woodson's contention that he should be excused for his failure to file, or cross-file, with the PHRC.  First, Woodson had already retained counsel prior to the filing of his charge with the EEOC in July 1992.  Second, Woodson had filed two prior discrimination complaints with the PHRC, and his testimony reveals that he knew of the cross-filing mechanism, as well as the requirement that he file with the PHRC.  A944,950 ("[I]n this case I went first to EEOC and found out that you also have to go initially to the State of Pennsylvania Commission of

failure to comply with its statutory or regulatory obligations under the theory that a plaintiff should not be punished for the behavior of the EEOC.  Woodson also points us to cases in which courts have allowed plaintiffs, under certain circumstances, who failed to comply with the applicable filing deadlines under Title VII to proceed with their claims under the doctrine of equitable tolling.  See, e.g., Zipes v. TWA, Inc., 455 U.S. 385, 102 S. Ct. 1127 (1982); Anderson v. Unisys Corp., 47 F.3d 302 (8th Cir.), cert. denied, 116 S. Ct. 299 (1995).

It is not clear, however, that the cases cited by the district court and by Woodson are relevant to the case at bar.  Most significantly, the cases mentioned above concern the federal anti-discrimination laws.  Woodson has not cited to any indication by the Pennsylvania Supreme Court that the PHRA filing requirement would be applied flexibly where the plaintiff's failure to satisfy the requirement resulted from the EEOC's failure to forward the charge as promised.  Moreover, while the timing requirements of the federal anti-discrimination laws have been held to be a procedural requirement rather than a jurisdictional limitation, it may well be that the filing requirement of the PHRA is a jurisdictional limitation, and hence, would not be subject to equitable principles.  As noted above, we leave this complicated problem to another day.

34

Human Relations as a first base.").

Moreover, on July 22, 1992, the day he filed his charge with the EEOC and failed to check the box on the charge indicating that he wanted his charge cross-filed with the PHRC, Woodson signed the acknowledgment that he was aware of the filing requirements under the PHRA. Thus, the record is clear that he knew of his obligations under the PHRA and simply failed to comply, which would make him ineligible for application of equitable principles.

Additionally, there is no evidence in the record that Woodson received or even knew about the letter dated July 29, 1992 from the EEOC indicating that it would file the charge with the PHRC. Finally and most importantly, there is no record evidence that Woodson relied on this representation in choosing to forgo filing a PHRC complaint. Therefore, the district court erred in concluding that the evidence showed that Woodson intended that a complaint be filed with the PHRC. Under these circumstances, we could not conclude that Woodson's failure to file a complaint with the PHRC is excusable even if we were to predict that the Supreme Court of Pennsylvania would apply equitable principles to the filing requirement.

For the foregoing reasons, the judgment of the district court will be reversed in part, and the district court will be directed to enter judgment in Scott's favor on Woodson's PHRA claim.

## IV.  The Jury Instructions

35

Scott also claims that the jury instructions were in error in two separate respects, and that we should remand for a new trial. We generally review jury instructions for abuse of discretion to determine whether they are misleading or inadequate. However, when the question is whether the instructions misstate the law, our review is plenary. <u>Savarese v. Agress</u>, 883 F.2d 1194, 1202 (3d Cir. 1989). We review each of Scott's contentions in turn.

## A.    "Direct Evidence" Instruction

We turn first to Scott's contention that the district court erred in instructing the jury with regard to the racist graffiti that appeared on a wall of the men's bathroom in the Chester plant in June or July of 1991. This charge read as follows:

> There was evidence of race-biased graffiti in a bathroom at the Chester plant. An employer that permits such graffiti to exist may be held responsible for the racial bias conveyed by it if it condones the graffiti or acquiesces in it. All of the facts and circumstances, including the employer's reaction, the steps, if any, taken by the employer to counteract the graffiti and what was reasonably required given the nature of the racial provocation, should be considered in deciding whether the employer's alleged lack of appropriate response bears on its racial attitude. In other words, it is direct evidence of the employer's intent to discriminate.

Scott contends that the district court erred in instructing the jury that the racist graffiti incident can constitute "direct evidence" of Scott's retaliatory intent.[17] While we do not

---

[17]Throughout this discussion, we refer to the "direct evidence" charge in terms of its relevance to the determination whether Scott fired Woodson with retaliatory animus, since the jury found against Woodson on the race discrimination claim. The charge itself refers only to discriminatory animus. However, the court instructed the jury on both claims jointly, and the reference to "discriminatory" animus accordingly describes both claims.

36

necessarily agree with Scott's argument, for the reasons that follow, we conclude that the district court erred in so instructing the jury.

We begin by noting that Scott's response to the graffiti incident is relevant to the question whether Scott acted with retaliatory intent. We have held on many occasions that an "atmosphere of condoned [racial] harassment in a workplace increases the likelihood of retaliation for complaints in individual cases." Glass v. Philadelphia Elec. Co., 34 F.3d 188, 195 (3d Cir. 1994) (internal quotation marks omitted); Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1086 (3d Cir. 1996). Accordingly, we reject Scott's objection to the instruction on the ground that Woodson has shown no evidence connecting the graffiti to his employment with Scott or Scott's decision to fire him. The adequacy of Scott's response to the graffiti is clearly relevant to whether Scott had the requisite intent to be held liable for retaliation, even if the graffiti itself was never specifically linked to Woodson. Turning to the instruction itself, we find it, when considered as a whole, to be misleading to the lay juror on several levels and, therefore, prejudicial to Scott.

First, the instruction might have suggested to a juror that the existence of the racist graffiti itself, rather than Scott's response to the graffiti, can constitute evidence of retaliatory intent. The relevant portion of the charge begins: "There was evidence of race-biased graffiti in a bathroom at the Chester plant." While the charge then goes on to inform the jury that

37

the adequacy of Scott's response is relevant to the issue of retaliatory animus, this aspect of the charge concludes with: "In other words, <u>it</u> is direct evidence of the employer's intent to discriminate." (emphasis added).

Although the charge as written was doubtless intended to refer only to Scott's response to the graffiti, and while that may be the fairest reading, we cannot gainsay that the instruction could have given a lay juror the impression that the graffiti itself could serve as evidence of Scott's retaliatory animus. In this respect, we highlight the fact that the last sentence of the charge concludes that "it" would be relevant to the question of discriminatory intent, without clearly specifying what "it" refers to. This could clearly lead a juror to infer that the racist graffiti itself was the "it" and to factor the graffiti itself into the consideration of whether Scott impermissibly retaliated against Woodson. Suggesting to the jury a connection between the graffiti itself and Scott would clearly be impermissible, as well as prejudicial to Scott, as there was no evidence whatsoever linking Scott or any of its decisionmakers to the graffiti.

Second, the district court erred in instructing the jury that Scott's response to the graffiti could constitute "direct" evidence of retaliatory intent for two related reasons. First, as we see it, the adequacy of Scott's response to the graffiti incident is only circumstantial rather than direct evidence of Scott's discriminatory animus. Direct evidence is evidence "that proves an ultimate fact in the case without any process of

inference, save . . . the inferences of credibility."  22 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5214, at 265 (1978).  In contrast, circumstantial evidence is offered to prove an ultimate fact, but an inferential step by the factfinder is required to reach that fact.

It seems clear to us that, even if the charge pointed only to Scott's response to the graffiti, this incident can be only circumstantial, rather than direct, evidence of Scott's intent when it fired Woodson.  If the evidence showed that Scott's response to the graffiti incident was inadequate, the factfinder would still be an inferential leap away from concluding that this was evidence of Scott's retaliatory attitude.[18]

Moreover, later in the charge, the court defined direct evidence as "evidence given by a witness as to a fact which the witness has observed or perceived.  An example would be an eyewitness."  Even if the description of the graffiti incident as "direct" evidence alone would not have confused or prejudiced the jury, the charge is clearly misleading when considered in conjunction with the court's later definition of "direct" evidence.  The court's instruction could have led a juror to equate evidence of the graffiti incident with eyewitness testimony, which quite likely would have caused a juror to accord too much weight to the graffiti evidence.

---

[18]This conclusion is supported by our decision in Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 641 (3d Cir. 1993), in which we noted that a "court may consider as circumstantial evidence the atmosphere in which the company made its employment decisions."

These errors were amplified by the fact that the racist graffiti incident was the _only_ specific piece of evidence that the district court mentioned in the charge. This might have indicated to the jury that the graffiti incident, or the company's response to it, was somehow particularly important, and might have compelled an individual member of the jury to give this portion of the evidence more weight in his or her deliberations. This is a problem in its own right, for jurors should be free to weigh the evidence as they see fit. Moreover, by highlighting the graffiti incident in the charge, the district court might have called additional attention to the errors that we have explained above. As we have explained, a juror could have come away from the jury charge with the impermissible impression that the graffiti itself was direct evidence of retaliatory animus. Because the "direct evidence" instruction plays such a prominent role in the jury charge, suggesting to a juror that this particular evidence should be given significant weight in his or her deliberations, the errors in the instruction might have been magnified. Thus, the suggestion that the graffiti itself was direct evidence of Scott's retaliatory intent, coupled with the fact that the graffiti incident was highlighted in the instruction, might have worked significant prejudice against Scott.

For the foregoing reasons, we conclude that the district court's "direct evidence" charge was inconsistent with the exercise of sound discretion. We reject Woodson's rejoinder that any error in the instruction is harmless because the instruction

40

deals only with the discrimination claim, and not the retaliation claim. According to Woodson, the charge does not address retaliatory intent in any way, nor does it connect the graffiti incident to the retaliation claim, and hence, it could not have confused the jury with respect to the retaliation claim. The district court rejected this contention on the ground that, given the factual context, it is impossible to separate the race discrimination claim from the retaliation claim. We agree. The district court instructed the jury with respect to the discrimination and retaliation claims jointly, and did not at any point distinguish between the two claims. As we see it, the jury would have assumed that the charge referred to both claims, even though this portion of the charge refers specifically only to Scott's "racial attitude" and "intent to discriminate."

In a more general sense, we cannot hold the error to be harmless. Under our standard of harmless error in civil cases, see McQueeney v. Wilmington Trust Co., 779 F.2d 916, 917 (3d Cir. 1985), we cannot say that there is a high probability that the error did not affect the outcome of the case. We must, therefore, reverse the judgment and remand for a new trial on the retaliation claim.

## B. Motivating Factor v. Determinative Effect

Scott's next contention on appeal is that the district court erred in instructing the jury that it could hold Scott liable under Title VII and the PHRA for retaliation if Woodson's filing of complaints with the EEOC and the PHRC was a "motivating

factor" in the decision to discharge him.[19] Scott argues that the jury should have been instructed, under Griffiths v. CIGNA Corp., 988 F.2d 457, 472 (3d Cir. 1993), and Miller v CIGNA Corp., 47 F.3d 586, 595 (3d Cir. 1995) (en banc), that, to find Scott liable, retaliatory animus must also have had a "determinative effect" on Woodson's termination.

We agree that Third Circuit precedent requires a district court to instruct the jury that it can hold a defendant liable only if the prohibited activity had a determinative effect on the decision to terminate the plaintiff.[20] In Griffiths, we ordered a new trial in a retaliation case proceeding under a pretext theory where the district court had erroneously instructed the jury that it need find only that an impermissible factor was a "motivating factor" to find for the plaintiff. We held that, while after Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), a motivating

---

[19]The instruction read in part:
He need not prove that his race or the alleged retaliation was
        the only factor or reason in the employer's decision.
        But, he must prove that either race or retaliation was
        a motivating factor or reason. In other words, that it
        played a role in Scott's decision to terminate him. . .
        . In any event, in such a case, the ultimate question,
        the final question for the jury to decide is whether,
        based on all the evidence in the case, plaintiff has
        proven by a preponderance of the evidence that he was
        discharged either because of his race or in retaliation
        for filing the charges. In other words, that race or
        retaliation was a motivating factor, a factor that
        played a role in the employment decision to terminate
        him.

[20]Our cases have heretofore applied the same standard in retaliation cases as in discrimination cases. Waddell v. Small Tube Products, Inc., 799 F.2d 69, 73 (3d Cir. 1986). Moreover, Title VII standards generally apply in PHRA cases. Griffiths, 988 F.2d at 471 n.14.

factor instruction is correct in a mixed motives case, <u>Price Waterhouse</u> did not change the analysis in pretext cases and hence a "motivating factor" instruction is improper in such cases. <u>Griffiths</u>, 988 F.2d at 471-72.

In <u>Miller</u>, a subsequent <u>en banc</u> decision, we clarified the standard that should be used in pretext cases, holding that a district court must instruct a jury that the plaintiff's burden is to prove that an impermissible factor "played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process." <u>Miller</u>, 47 F.3d at 588. Thus, it is clear that if <u>Miller</u> governs this case, as Scott argues, the instruction given was in error, because the "determinative effect" instruction should have been given. <u>See Wilson v. Susquehanna Township Police Dep't</u>, 55 F.3d 126, 130 (3d Cir. 1995) (noting "determinative effect" standard).

The district court held, however, and Woodson argues on appeal, that the Civil Rights Act of 1991, Pub. L. No. 102-166, changed the legal landscape with respect to the standard of proof in such cases. Section 107(a) of the 1991 Act legislatively overruled the holding in <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228 (1989), that even if a plaintiff proved that discrimination was a motivating factor for an employment decision, an employer could still prevail if it could show that it would have reached the same decision even in the absence of the discriminatory motive. This section provides:

> In General.-Section 703 of the Civil Rights Act of 1964 (42 U.S.C. 2000e-2) . . . is further amended by adding at the end the following new subsection:
> "(m) Except as otherwise provided in this title, an

> unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated this practice."

Section 107(b) limits the available remedies in the case envisioned by the Price Waterhouse Court: where the plaintiff proves that discrimination was a motivating factor in the employment decision but the defendant responds by demonstrating that it would have reached the same result in the absence of the unlawful motive.  In such a case, a court may not award damages and may only grant declaratory relief, certain injunctive relief, and the costs directly attributable to pursuing the claim under § 107(a).  42 U.S.C. § 2000e-5(g)(2)(B).

Woodson contends that § 107 also effectively overruled Griffiths and Miller and, accordingly, applies to his case. Therefore, Woodson continues, the district court did not err in instructing the jury that Scott could be found liable if retaliation was a "motivating factor" in the decision to fire Woodson.  In response, Scott argues that § 107 of the 1991 Act does not apply and that Griffiths and Miller govern Woodson's retaliation claim.  It makes two separate contentions in support of this argument: (1) that § 107 does not apply to retaliation cases[21]; and (alternatively) (2) that § 107 does not apply to

---

[21]The district court held that Scott failed to object on this basis and hence waived the argument.  Scott at trial made a general objection to the charge, stating: "Your Honor, just for the record, I'd like to note my objection to instructing on the motivating factor without adding a reference to 'had a determinative effect' on the case."  The district court believed that Scott objected on the ground that § 107 did not apply to pretext cases, as Scott had filed a pre-trial brief to that effect.  Because Scott did not object until after trial on the

44

pretext, as opposed to mixed motive, cases.[22]

We consider first whether § 107 applies to retaliation cases. As this is a question of statutory construction, we begin as always with the plain meaning of § 107. Section 107 on its

specific ground that § 107 does not apply in retaliation cases, the district court deemed this objection waived under Fed. R. Civ. P. 51. 898 F. Supp. at 305 & n.17. In its appellate brief, Scott relied on its second argument and did not contest the district court's ruling on this point, though in a Fed. R. App. P. 28(j) submission Scott did press the point after argument.

Of course, even if the point was waived in the district court, we could reach the question if the the instruction was such that "the jury [was] without adequate guidance on a fundamental question and our failure to consider the error would result in a miscarriage of justice." McAdam v. Dean Witter Reynolds, Inc., 896 F.2d 750, 770 (3d Cir. 1990); Bennis v. Gable, 823 F.2d 723, 727 (3d Cir. 1987); see also Selected Risks Ins. Co. v. Bruno, 718 F.2d 67, 69 (3d Cir. 1983) ("It is the general rule that a federal appellate court does not consider an issue not passed upon below. This rule is one of discretion, rather than jurisdiction, and in the past we have heard issues not raised in the district court when prompted by exceptional circumstances." (footnote and citations omitted)). This is arguably so here in view of the importance of the legal issue to this case. We note too the plethora of employment discrimination cases pending in the district courts of this circuit. At all events, since this case must go back for a new trial, the district court will have to charge on the issue and will need guidance and hence we give it. We recognize that, if § 107 does not apply to pretext cases, we would not need to reach this issue, but we are not prepared to so hold at this time. On the other hand, if we were to hold that § 107 does apply to pretext cases, we would still have to reach the question whether § 107 applies to retaliation cases to resolve this issue. In sum, although Scott probably waived the point, we need to reach it anyway. The result, incidentally, confirms the need for a new trial.

[22]We observe that, although Miller was decided after the effective date of the 1991 Act, it does not end our inquiry with respect to whether § 107 applies to pretext claims. Miller was brought under the Age Discrimination in Employment Act (ADEA). Although historically we have relied on Title VII in crafting ADEA law, we did not consider whether the 1991 Act changed the standard to be used in pretext cases in Miller because the "substantive provisions of the 1991 Act that amended Title VII did not amend the ADEA, and Miller does not contend that section 107 is applicable to ADEA cases." Miller, 47 F.3d at 599 n.10.

45

face does not apply to retaliation claims.  It amends only 42 U.S.C. § 2000e-2, which prohibits discrimination "based on race, religion, or national origin," and does not mention § 2000e-3, the retaliation provision.  Moreover, the wording of the amendment does not even refer to retaliation claims, and explicitly governs cases involving claims of discrimination based only on "race, color, religion, sex or national origin."  Hence there is no reference in § 107 to either retaliation claims in general or § 2000e-3 in particular, suggesting that Congress intended that § 107 not apply to retaliation claims.  See Tanca v. Nordberg, 98 F.3d 680, 682-83 (1st Cir. 1996) (holding that plain meaning of § 107 requires that it not be applied to retaliation claims), cert. denied, __ S. Ct. __, 65 U.S.L.W. 3518 (Mar. 17, 1997); Reiss v. Dalton, 845 F. Supp. 742, 744 (S.D. Cal. 1993) (plain meaning of § 107 dictates exclusion of retaliation claims).  If this is the case, then § 2000e-3 claims of illicit retaliation are governed by the "determinative effect" standard and Miller.[23]

_____

[23]Another court relied on a plain meaning argument to reach the opposite conclusion.  In Heywood v. Samaritan Health System, 902 F. Supp. 1076 (D. Ariz. 1995), the court cited to a commentator who has concluded that § 107 applies to retaliation claims because "'[t]he section does not state this explicitly, but the mixed motive clause defines the conditions under which an "unlawful employment practice" is established.  The anti-retaliation provision of Title VII appears under the specific heading of "[o]ther unlawful employment practices."'" Id. at 1081 n.1 (quoting 2 Lex K. Larson, Employment Discrimination § 35.04[1]).  We are not persuaded by this argument.  By its own terms, § 107 provides the standard for determining whether an employment practice is unlawful "[e]xcept as otherwise provided in this title."  Because § 107 does not reference retaliation and § 2000e-3 provides a standard for deciding retaliation cases, we believe that the § 2000e-3 alone provides the standards for judging whether an action was taken in retaliation for protected

46

Scott's argument that § 107 does not govern retaliation claims is supported by the fact that the 1991 Act elsewhere specifically mentions retaliation claims. Section 102 of the Act provides that compensatory and punitive damages are available in actions brought under § 2000e-2 <u>and</u> in actions brought under § 2000e-3.[24] It is generally the case that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." <u>Russello v. United States</u>, 464 U.S. 16, 23 (1983) (internal quotation marks omitted). Because Congress dealt with retaliation claims elsewhere in the 1991 Act, but not in § 107, it would seem reasonable to assume that § 107 does not apply to retaliation claims. <u>See</u> <u>Tanca</u>, 98 F.3d at 683–84; <u>Riess</u>, 845 F. Supp. at 745.

We are given pause by the fact that we and other courts have generally borrowed from discrimination law in determining the burdens and order of proof in retaliation cases. This understanding could lead us to the opposite result in considering activity.

[24]Additionally, although § 107(b), which governs the remedies when a plaintiff proves that an impermissible factor motivated the decision and the defendant demonstrates that the decision would have occurred in the absence of that factor, also does not mention retaliation, 42 U.S.C. § 2000e-5(5)(g)(2)(A), the subsection that immediately precedes § 107(b) in codified form <u>does</u> reference claims brought under § 2000e-3. <u>See</u> <u>Riess</u>, 845 F. Supp. at 745 ("The fact that Congress expressly treated Section 2000e-3(a) violations in such close proximity to Section 107(b) demonstrates that where Congress intended to address retaliation violations, it knew how to do so and did so explicitly.").

47

this question.  That is, we could say that Congress knew of the practice of borrowing in retaliation cases, and presumed that courts would continue this practice after the 1991 Act.  Considering the question with this assumption in mind, Congress's failure to reference § 2000e-3 specifically in § 107 would not mean that § 107 does not apply in retaliation cases; rather, it would mean that Congress assumed that it was unnecessary for it to do so because courts would borrow the "motivating factor" language in deciding retaliation claims.[25]

We are not persuaded by this argument.  The legislative history is at best unclear as to whether Congress intended that retaliation claims would be governed by § 107.  It fails even to mention retaliation claims specifically.  The most that Woodson points to are general statements that Congress intended to make it easier for plaintiffs to prevail in employment discrimination cases by legislatively overruling Price Waterhouse: "If Title VII's ban on discrimination in employment is to be meaningful, victims of proven discrimination must be able to obtain relief,

---

[25]The House Report states that "[t]he Committee intends . . . that other laws modeled after Title VII be interpreted consistently in a manner consistent with Title VII as amended by this Act.  For example, disparate impact claims under the ADA should be treated in the same manner as under Title VII."  H.R. Rep. No. 40(II), 102d Cong., 1st Sess. 4 (1991), reprinted in 1991 U.S.C.C.A.N. 694, 697.  While this might be read to suggest that courts should apply the "motivating factor" standard in retaliation cases, it could also be read to encourage borrowing when deciding cases brought under different statutes rather than different provisions in the same statute.  Assuming, moreover, that Congress knew of judicial borrowing in employment discrimination cases, we could reach the conclusion that Congress wanted to avoid borrowing in retaliation cases by referencing § 2000e-3 in some provisions of the 1991 Act but not in § 107.

and perpetrators of discrimination must be held liable for their actions.  Price Waterhouse jeopardizes that fundamental principle."  H.R. Rep. 40(I), 102d Cong., 1st Sess. 47 (1991), reprinted in 1991 U.S.C.C.A.N. 549, 585.  We find that such statements do not evidence a clear intent that § 107 apply to retaliation cases.[26]  It is a maxim of statutory interpretation that "[a]bsent a clearly expressed legislative intention to the contrary [the] language [of a statute] must ordinarily be regarded as conclusive."  Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 835 (1990) (internal quotation marks omitted).

We thus must be guided by plain meaning, and we conclude that § 107 does not apply to retaliation cases.[27]  Hence, the

[26]One commentator has suggested that policy arguments also counsel against reading the motivating factor instruction into retaliation cases: "Congress may have been more concerned with protecting individuals directly discriminated against because of the prohibited factor itself than with those discriminated against because they opposed an unlawful practice."  John L. Flynn, Note, Mixed-Motive Causation Under the ADA: Linked Statutes, Fuzzy Thinking and Clear Statements, 83 Geo. L.J. 2009, 2018 n.53 (1995).

[27]In reaching the holding that § 107 does not apply to retaliation claims, we note that while we follow some federal courts, see Tanca, supra; Riess, supra; see also David A. Cathcart & Mark Snyderman, The Civil Rights Act of 1991, C108 ALI-ABA 251, 292-93 (1994), other courts have apparently held that § 107 does apply to retaliation claims.  Most of these courts, however, have applied § 107 to retaliation claims without analysis.  See Veprinsky v. Fluor Daniel, Inc., 87 F.3d 881, 893 (7th Cir. 1996); Beinlich v. Curry Development, Inc., 1995 WL 311577, at *3 (4th Cir. May 22, 1995); Hall v. City of Brawley, 887 F. Supp. 1333 (S.D. Cal. 1995); Doe v. Kohn, Nast & Graf, P.C., 862 F. Supp. 1310 (E.D. Pa. 1994) (ADA case); see also Lewis v. American Foreign Serv. Ass'n, 846 F. Supp. 77, 82 (D.D.C. 1993) (applying § 107 to retaliation cases brought under 42 U.S.C. § 1981 because courts borrow from Title VII, without considering whether § 107 applies to retaliation claims brought under Title VII).  The only case cited to us by the parties that

district court abused its discretion in failing to instruct the jury that improper motive must have had a determinative effect on the decision to fire Woodson, as we required in <u>Miller</u>.[28] Because we have concluded that § 107 of the Civil Rights Act of 1991 does not apply to Woodson's claim, we need not reach the second question: whether § 107 applies to "pretext" claims like Woodson's or whether it is limited to "mixed motive" claims.[29]

has specifically held that § 107 applies to retaliation cases, however, is not persuasive and does not apply basic principles of statutory construction as we have above. <u>See</u> <u>Heywood</u>, 902 F. Supp. at 1081 & n.1 (acknowledging that neither § 107 nor the legislative history mention retaliation claims but concluding that "it is certainly reasonable to assume that the Congressional policy articulated in the amendment and in the House report reaches retaliation as well as the enumerated considerations").

We are further persuaded that the motivating factor instruction was erroneous in this case because Woodson was awarded both compensatory and punitive damages. Under § 107(b), as we explained <u>supra</u>, a plaintiff who succeeds in showing that an illegitimate factor motivated his or her termination cannot be awarded damages if the employer demonstrates that it would have made the same decision in the absence of the illegitimate motive. The district court did not instruct the jury that it must determine whether Scott had shown that it would have fired him even in the absence of the retaliatory motive, as § 107(b) would seem to require.

[28]The district court concluded that if there were any error in the instruction given, this error was harmless because the jury would have reached the same conclusion even if it had been properly charged. Because the jury, in awarding punitive damages, found that the defendant acted with "malice or reckless indifference to [plaintiff's] rights," the district court reasoned, the difference between "motivating" and "determinative" was immaterial. 898 F. Supp. at 308. We disagree. The jury could conceivably have concluded that Scott acted with malice toward Woodson when it decided to terminate him based in part on an illegitimate motive, even if that illegitimate factor did not have a determinative effect.

[29]With respect to this question, we note that, according to Scott, the 1991 amendments were intended to overrule legislatively the standards of liability established in <u>Price Waterhouse</u> for mixed motives cases. The Supreme Court, in dicta, has acknowledged as much: "§ 107 responds to <u>Price Waterhouse v. Hopkins</u> by setting forth standards applicable in 'mixed motive'

50

## V. Conclusion

For the foregoing reasons, we will affirm in part and reverse in part. We agree with the district court that the evidence is sufficient as a matter of law to support a jury finding of unlawful retaliation by Scott against Woodson and to that extent we affirm the denial of Scott's Rule 50 motion. However, because no verified complaint was filed with the

---

cases." Landgraf v. USI Film Prods., 114 S. Ct. 1483, 1489–90 (1994). Moreover, the Fourth Circuit, the only circuit that has specifically considered this issue, has held that § 107 only governs mixed motive cases. Fuller v. Phipps, 67 F.3d 1137, 1143–44 (4th Cir. 1995).

While Scott's position has much to commend it, proper resolution of this question is far from clear. As the district court noted in rejecting Scott's contention in this regard, there is some support for the view that § 107(a) has created one standard to be applied in both pretext and mixed motive cases. The amendment itself is not limited to mixed motive cases, and the legislative history provides additional support for this position. See H.R. Rep. No. 40(I), 102d Cong., 1st Sess. 45, 48–49 (1991), reprinted in 1991 U.S.C.C.A.N. 549, 583, 586–87. Many courts have applied § 107(a) to pretext cases, albeit without discussion of this point, see, e.g., Harris v. Shelby County Bd. of Educ., 99 F.3d 1078 (11th Cir. 1996); Hall v. City of Brawley, 887 F. Supp. 1333 (S.D. Cal. 1995); Johnson v. El Paso Pathology Group, P.A., 868 F. Supp. 852 (W.D. Tex. 1994), and several model jury instructions suggest doing so as well, see, e.g., American Bar Ass'n Model Jury Instructions for Employment Litigation 1.02[1]; 1.02[2][a] (1994). This court has expressly left open the question whether a "determinative effect" instruction should be given in a pretext case after the 1991 Act. Hook v. Ernst & Young, 28 F.3d 366, 368, 371 (3d Cir. 1994). Because we dispose of this case on other grounds, we again decline to reach this issue.

At all events, whatever the standard should be, there is certainly considerable force to Judge Greenberg's view that one standard for both mixed motive and pretext cases would be far preferable, and have the additional benefit of simplifying and clarifying employment discrimination law. See Miller, 47 F.3d at 599 (Greenberg, J., concurring) ("I would dispense altogether with the terms 'pretext' and 'mixed motives' and hold explicitly that the same standard applies to all disparate treatment cases.").

Pennsylvania Human Relations Commission, we will reverse the denial of the Rule 50 motion in this respect and direct the district court to enter judgment in Scott's favor on Woodson's retaliation claim under the Pennsylvania Human Relations Act. Finally, because of errors in the jury instructions, we will reverse the denial of the Rule 59 motion and remand for a new trial on the retaliation claim. The parties shall bear their own costs.

_____