Robert DUBOSE, Plaintiff,

v.

DISTRICT 1199C, NATIONAL UNION OF HOSPITAL AND HEALTH CARE EMPLOYEES, AFSCME, AFL–CIO, and Temple University Hospital, Defendants.

No. CIV. A. 98–2845.

United States District Court, E.D. Pennsylvania.

June 9, 2000.

Olugbenga O. Abiona, Philadelphia, PA, for Plaintiff.

Gail Lopez–Henriques, Philadelphia, PA, for Defendants.

*MEMORANDUM*

LOWELL A. REED, Jr., Senior District Judge.

This lawsuit arises from the termination of plaintiff Robert Dubose ("Dubose") from his position as an environmental service attendant at Temple University Hospital ("Temple"). Dubose sued his former employer as well as his former collective bargaining representative, District 1199C, National Union of Hospital and Health Care Employees, AFSCME, AFL–CIO ("Union"), alleging violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA") and the Pennsylvania Human Relations Act, 43 P.S. § 951 et seq. ("PHRA"). Dubose also asserts claims under the Pennsylvania Public Employee Relations Act, 43 P.S. § 1101.101 et seq. ("PERA").

Presently before the Court is the motion of Temple for summary judgment (Document No. 40) and the motion of the Union for summary judgment (Document No. 41), the response of Dubose as well as the replies thereto. Also before the Court is the motion of the Union for sanctions (Document No. 48). Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 & 1367. Based upon the following analysis, the motion of Temple for summary judgement will be granted in part and denied in part. The motion of the Union for summary judgement will be granted in part and denied in part. The motion of the Union for sanctions will be denied as moot.

## I. Background[1]

Dubose was hired by Temple as an environmental service attendant in August of 1990. He was represented, for purposes of collective bargaining, by the Union. On September 28, 1992, Dubose suffered a workplace injury, tearing a ligament and injuring his right wrist. The injury caused him to miss approximately eight weeks of work. (Plaintiff's Exhibits In Opposition

---

1. The following facts are based on the evidence of record viewed in the light most favorable to Dayoub, the nonmoving party, as required when considering a motion for summary judgment. *See Carnegie Mellon Univ. v. Schwartz,* 105 F.3d 863, 865 (3d Cir.1997).

to Defendants' Motions for Summary Judgement ("Plt. Exh."), Tab 54, Deposition of Robert Dubose ("Dubose Dep.") at 15). In 1993, Dubose re-injured his wrist. The injury to his wrist, according to Dubose, limited his ability lift heavy objects. As a result, Dubose testified at his deposition that a Temple physician restricted him to "light duty." (*Id.; see also* Plt. Exh., Tab 41 at 21). According to Dubose, "light duty" meant that Temple should have given him less work than was assigned to other employees. (Dubose Dep. at 29–30). Again, according to Dubose, despite his complaints to his supervisors, Temple ignored his doctor's request that he be assigned to "light duty." (*Id.*). Dubose further asserts that instead of being assigned less work, he was in fact assigned more work. In support of this assertion, Dubose has submitted a few work assignment sheets on which he indicated that he was unable to complete the assigned tasks. The record, however, shows that, despite his injury and alleged inability to complete work assignments, Dubose did not missed any time from work due to his wrist injury nor did he seek medical treatment for his wrist after 1993. Nor was Dubose disciplined for poor work performance or an inability to perform assigned tasks. It is also undisputed that Dubose never filed a grievance with the Union complaining about his work load or that Temple was not accommodating his lifting limitation. Indeed, Dubose apparently never told anyone that he thought that he was doing more as opposed to less work and never submitted anything in writing that explained that he was being assigned too much work. (*Id.* at 31–32).

Dubose alleges that, in early December of 1996, he suffered some sort of mental breakdown which was caused by his excessive work load and Temple's refusal to honor his doctor's request that he be restricted to light duty. As a result, Dubose asserts that he was unable to report for work. He maintains, however, that he informed Temple of his condition and that he should have been accommodated or granted sick leave. Temple terminated Dubose on December 11th, in accordance with its policy of terminating employees who are absent for three or more days without an excuse.

It is undisputed that Dubose was absent from work on December 3, 1996, and that he notified Paul Jones, a Temple management official, that he would be absent. (Dubose Dep. at 71). Dubose claims that he told Jones that he was seeking medical help for a mental condition and that he made it clear to Jones that his absence would be indefinite. (*Id.*). Temple asserts, however, that Dubose only told Jones that he would be absent for one day and did not specify that he was suffering from a mental disorder. In a contemporaneous memo-to-the-file, Jones wrote "This afternoon Mr. Dubose called saying he was calling out sick for the day. I told Mr. Dubose that he had to bring in a Drs. note. He said ah-ok and hung up." (Exhibits Supporting Defendant Temple University Hospital's Motion for Summary [Judgement] and Request for Oral Argument ("Temple Exh."), Tab 13).

It is also undisputed that Dubose was absent from work on December 4th, 5th, 7th and 8th, his next four scheduled work days. It is also undisputed that Dubose did not call out on those days. (Dubose Dep. at 76–77). Temple terminated Dubose on December 9th, when according to Temple, Dubose had been absent without an excuse for four days. It is Temple's asserted policy to terminate employees who are absent for three or more days without an excuse.

The parties also differ in their account of an incident occurring on December 5th. It is undisputed that on December 5th, Dubose came to the Environmental Service office at Temple to pick up his paycheck. The parties dispute, however, what transpired during his visit. According to Dubose, the person who gave him his check asked why he had not shown up for work. Dubose responded that Paul Jones knew what was going on and did not want to discuss it. When asked whether he

wanted to talk to Bernice Sierchio, the director of Environmental Services, Dubose said that he did not want to speak with her. (Plaintiff's Brief in Opposition to Defendant Temple University Hospital's and District 1199C's Motions for Summary Judgment ("Plt. Brief"), Affidavit of Robert Dubose, Exh. A ("Dubose Affidavit") at ¶ 12).

Temple, on the other hand, asserts that Dubose was told by his supervisor and Sierchio's secretary that Sierchio wanted to speak to him and that his refusal amounted to insubordination. However, a contemporaneous note handwritten by Sierchio's secretary states "I asked Mr Duobse what happened (in reference to his no call-no show on 1¾ and 12/5). He said 'I can't talk to you about it. I asked Mr. Dubose if he wanted to speak to Mrs. Sierchio. He said, 'I can't talk to he [sic] about it either.'" (Temple Exh., Tab 17). A later typewritten memo-to-the-file dated December 6th states that she told Dubose that Sierchio wanted to speak to him and that she asked Dubose to see Sierchio but that he declined, saying he would see her the next day. (Temple Exh., Tab 18). In any event, Dubose notes that Temple did not fire or discipline Dubose for insubordination. He was terminated for unexcused absences.

Dubose sought help for his mental condition at Mt. Sinai Hospital in Philadelphia, on an outpatient basis, commencing on or about December 3, 1996. While at Mt. Sinai, Dubose was diagnosed by Parviz Yeroushalmi, M.D., his treating physician, as suffering from "Major Depression Single Episode." (Motion for Summary Judgement of Defendant District 1199C, ("Union Mot."), Exh. C at 26; Exh. D at 000098). At his deposition, Dr. Yeroushalmi specifically noted that Dubose did not meet the diagnosis for "dysthmic disorder" because that disorder requires a manifestation of symptoms for at least two years. (Id., Exh. C at 50). Dr. Yeroushalmi further testified that Dubose had not been diagnosed as suffering from a "chronic major depressive episode" and expressed his opinion that Dubose's mental condition was not chronic. (Id. at 50–52).

The exact length of Dubose's treatment is unclear. The medical records from Mt. Sinai indicate that Dubose received treatment, at least intermittently, through July 1997. (Id., Exh. D). The records from Mt. Sinai reflect that Dr. Yeroushalmi initially predicted that Dubose would be well enough to resume working by January 20, 1997. (Id. at 000098). This predicted return date was subsequently pushed back. On April 16, 1997, Dr. Yeroushalmi completed a disability claims form that specified the return-to-work date as May 30, 1997. (Union Mot., Exh. C at 36; Exh. D at 000117).[2] However, on May 14, 1997, Dr. Yeroushalmi prepared notes indicating that Dubose "declare[d] that he doesn't have any intention to return to that job." (Id., Exh. C at 42; Exh. D at 000122). On June 11, 1997, Dr. Yeroushalmi noted in his patient file that Dubose "has continued to be very demanding and manipulative. He doesn't show any interest and motivation to return to work, despite the fact that his mental status has improved remarkably. He is unrealistic about medical leave and wanted to extend it beyond reasonable medical excuse." (Id., Exh. C at 43; Exh. D at 000123). As part of his legal argument, Dubose asserts both that he was able to return to work after January 17, 1997, and that he was able to return to work as of March 16, 1997. (Plt. Brief at pp. 26 & 29).

As previously mentioned, Dubose was terminated on December 9, 1996. Upon receiving his letter of termination on December 10, 1996, Dubose called Linda Fields, the Union Organizer at District 1199C to file a grievance. He was unable to reach her. Dubose, however, left her a message saying he had been terminated and wanted to file a grievance. Fields did not return Dubose's call. Dubose then went to the Union Hall. In the lobby,

---

**2.** Interestingly, Dr. Yeroushalmi never saw a copy of Dubose's job description until just prior to a deposition taken on October 5, 1999. (Temple Exh., Tab 29 at 89).

Dubose saw Henry Nicholas, President of District 1199C, and told him that he had been terminated and wanted to file a grievance. Nicholas directed Dubose to Fields who is the Union official responsible for filing grievances on behalf of Temple employees who are members of the Union. Not finding Fields in her office, Dubose again left a message for her. (Dubose Affidavit at ¶¶ 13–15).

The next day, December 11th, Dubose went to Mt. Sinai for treatment. At the hospital he met with the Director to the Partial Hospital Program, Dr. Warner. After apprizing Dr. Warner of his situation, Dr. Warner called the Union. Dr. Warner was able to reach Fields and discussed the Dubose's situation with her. Fields requested that Dr. Warner fax her a copy of the termination letter and a release signed by Dubose for her to obtain his medical records at Mt. Sinai. (Dubose Affidavit at ¶ 16). In his fax, Dr. Warner explained to Fields that he had a copy of Dubose's assessment of December 4, 1996, and that Dubose had been trying to start treatment since that date. (Plt. Exh., Tabs 6 & 38).

Dubose met with Fields on the following day, confirmed that she received the fax and was told by Fields that she would initiate a grievance proceeding with Temple. (Dubose Affidavit at ¶ 17). It is uncontested, however, that Fields never initiated a grievance. It is also uncontested that Fields avoided Dubose and consistently advised Donna Ford, the Executive Vice President of District 1199C, that she was assisting Dubose with his need for a medical leave of absence, omitting that Temple had terminated Dubose and that she had not filed a grievance. (Dubose Affidavit at ¶ 17; Plt. Exh., Tab 58 at 38–43, 60–65, 70–75, and 76–82).

In January of 1997, Fields requested that Dr. Warner provide her with information about when Dubose would be able to return to work. (Plt. Exh., Tab 46; Dubose Affidavit at ¶ 17). On January 6, 1997, Dr. Warner wrote to Fields advising her that Dubose would be able to return to work after January 17, 1997. Fields did not share this information with Temple.

Fields did, however, approach Temple about Dubose's case, seeking consideration because he had a serious situation. (Temple Exh., Tab 20 at 70; Tab 21 at 156). According to Temple, sometime in either late February or early March 1997, Fields spoke with Richard Lutman of Temple's Labor Relations Office and asked for a meeting to discuss Dubose's situation. (Id., Tab 20 at 70). During her conversation with Lutman, Fields conceded that her request was untimely and that no grievance had been filed. (Id., Tab 20 at 70; Tab 21 at 201). Fields, however, maintains that she contacted Temple in late December or early January regarding Dubose. (Id., Tab 21 at 154).

According to Temple, it agreed to accommodate Fields' request and meet with Dubose, although such a meeting was unprecedented. Temple maintains, however, that the meeting was not a grievance hearing and it never considered it to be one. Lutman asked Fields to bring evidence documenting Dubose's condition to the meeting. (Temple Exh., Tab 20 at 68–71). Lutman, Sierchio, Sharon Boyle (Lutman's assistant), Fields and Dubose met on March 6, 1997.

At the meeting, Fields spoke on Dubose's behalf, indicating that Dubose had suffered a serious medical condition which explained his unexcused absences. Despite being told that Temple would need medical documentation of Dubose's condition, Fields did not provide any supporting medical documentation. Also a topic of discussion was the fact that no grievance had ever been filed. According to Dubose, this apparently was the first time he learned that no grievance had been filed. Indeed, according to Dubose, Fields had told him that the March 6th meeting was a grievance hearing. (Dubose Affidavit at ¶ 19).

Although Temple agreed to consider Dubose's condition, it reiterated at the meeting that it needed medical documentation of Dubose's condition. After the meeting,

Fields informed Dubose, that it would be necessary for him to authorize the release of his medical information to Temple. Dubose did not immediately do so.[3] On March 24, 1997, Fields wrote to Dubose explaining that it could do little to advance his cause if he did sign a consent allowing the Union to the release the information sought by Temple. (Temple Exh., Tab 25.) On July 2, 1997, Dubose hand delivered the signed consent to Fields. Temple received a copy of the consent form on July 7, 1997. On July 8, 1997, Fields sent Dubose a letter indicating that the Union was "canceling" its file in this matter. (*Id.*, Tab 37).

On July 10, 1997, Dubose filed out a "Charge Questionnaire" with the EEOC. (Plt. Exh., Tab 8). In the questionnaire, Dubose alleges that Temple discriminated against him on the basis of race, religion and disability. (*Id.*). On August 14, 1997, Dubose filled out a Charge Questionnaire alleging that the Union had breached its duty of fair representation. Dubose signed a Charge of Discrimination against the Union on September 30, 1997. (Temple Exh., Tab 39). On March 4, 1998, Dubose received a right to sue letter with respect to his charge of discrimination against the Union. (*Id.*, Tab 45).

On October 24, 1997, Dubose received an appointment notice from the EEOC, stating that he had an appointment on December 2, 1997, to discuss the "possible filing of a charge of employment discrimination." (Plt. Exh., Tab 11). On December 2, 1997, Dubose signed a Charge of Discrimination against Temple. (Temple Exh., Tab 43). On September 22, 1998, Dubose received a right to sue letter with respect to his charge of discrimination against Temple.

(*Id.*, Tab 49). Dubose filed this lawsuit against the Union on June 3, 1998. The complaint was amended in response to a motion to dismiss on July 6, 1998. The amended complaint was amended for a second time on November 3, 1998, to add Temple as a defendant.

## II. Legal Standard Summary Judgment

Defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. Under Federal Rule of Civil Procedure 56(c), summary judgment may be granted when, "after considering the record evidence in the light most favorable to the nonmoving party, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). For a dispute to be "genuine," the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party may not rely merely upon bare assertions, conclusory allegations, or suspicions. *Fireman's Ins. Co. v. Du Fresne*, 676 F.2d 965, 969 (3d Cir.1982).

## III. Discussion [4]

Defendant Temple argues that Dubose did not timely file a charge with the EEOC

---

**3.** Dubose explains that he had already consented to have his medical records released to the Union and, therefore, did not want to sign another consent/release form. Having provided a release for his medical records to the Union, however, does not explain why he delayed in providing the Union with permission to share his records with Temple.

**4.** The quality, or lack thereof, of plaintiff's submissions to this Court are truly distress-

ing. Although plaintiff's counsel has submitted over 400 pages of exhibits and a fifty page memorandum of law in response to the motion for summary judgment, there is not one citation to the record after page 12 of the brief, including a section entitled "contested facts." Not only does plaintiff's counsel fail to rely on the record evidence but he also includes citations to a nonexistent record, such as a citation to instructions issued by the Director of the Environmental Services De-

and therefore Dubose's claims against it are time barred. Temple, joined by the Union, further argues that Dubose's ADA claim fails as a matter of law. Temple also argues that to the extent that this litigation does go forward, this Court should issue an Order that the Union is to indemnify Temple for any damages. With respect to Dubose's fraud, negligence and breach of contract claims, the Union argues that Dubose is limited to a claim for the breach of the Union's duty of fair representation under PERA. The Union further argues that Dubose's breach of the Union's duty of fair representation must fail because he cannot prove that Temple violated the collective bargaining agreement when it terminated Dubose.

## A. *Exhaustion of Administrative Remedies*

The requirement that a plaintiff must exhaust all administrative remedies before seeking judicial relief is a well excepted tenet of administrative law. *Robinson v. Dalton,* 107 F.3d 1018, 1020 (3d Cir.1997); *Payne v. Consolidated Rail,* 2000 WL 190229, at *3 (E.D.Pa. Feb. 16, 2000) (ADA plaintiff must exhaust administrative remedies); *Melincoff v. East Norriton Physician Serv., Inc.,* 1998 WL 254971, at *2 (E.D.Pa. Apr.20, 1998) (same). The exhaustion requirement "is designed to provide sufficient notice to the defendant concerning the charges and obtain voluntary compliance without resort to litigation." *Fucci v. Graduate Hosp.,* 969 F.Supp. 310, 315 (E.D.Pa.1997). The administrative prerequisites to filing employment discrimination claims under the ADA are no exception. *Melincoff,* 1998 WL 254971, at

*2; *Fosburg v. Lehigh Univ.,* 1999 WL 124458, at *5 (E.D.Pa. Mar.4, 1999).

An ADA plaintiff must follow the same administrative procedures set forth in Title VII, 42 U.S.C. § 2000e–5. *Churchill v. Star Enter.,* 183 F.3d 184, 190 (3d Cir. 1999); *see also* 42 U.S.C. § 12117(a) (stating that powers, remedies and procedures of ADA shall be same as those of 42 U.S.C. § 2000e–5). Title VII explicitly requires a complainant to file a timely discrimination charge with the EEOC as a prerequisite to filing a lawsuit in federal court. *EEOC v. Commercial Office Prods.,* 486 U.S. 107, 110, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988); *Woodson v. Scott Paper Co.,* 109 F.3d 913, 926 (3d Cir.1997), *cert. denied,* 522 U.S. 914, 118 S.Ct. 299, 139 L.Ed.2d 230 (1997). Federal courts do not have jurisdiction to hear discrimination claims unless a timely charge has been filed with the EEOC. 42 U.S.C. § 2000e–5(e)(1); *Lantz v. Hosp. of Pennsylvania Univ.,* 1996 WL 442795, at *2 (E.D.Pa. Jul.30, 1996). Generally, under Title VII, a charge of employment discrimination must be filed with the EEOC within 180 days of the last alleged act of discrimination. 42 U.S.C. § 2000e–5(e)(1); *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1385 (3d Cir.1994). The statute also provides that, in a deferral state such as Pennsylvania, which has a state agency to adjudicate discrimination cases, if a claimant initially files a complaint with a state or local agency, a charge can be filed with the EEOC up to 300 days after the discriminatory act. *Id.; Melincoff,* 1998 WL 254971, at *7; *see also Howze v. Jones & Laughlin Steel Corp.,* 750 F.2d 1208, 1210 (3d Cir.1984 ) ("It is undisputed that Pennsylvania is a

partment to Dubose's supervisors regarding "limited assignments ... with no expiration date as to this limitation" which is supposedly found at Tab 24. No such record can be found at Tab 24. Nor has the Court found any such a record in the evidence submitted by Dubose. As counsel well knows, to prevent summary judgment from being granted he must point to the evidence in the record to support his contentions. Bare assertions will not defeat a motion for summary judgment.

In addition, plaintiff's counsel makes many irrelevant arguments—arguing, for instance, in response to defendants claim that the administrative charge was untimely that the scope of the action is determined by the EEOC charge—and arguments unsupported by the law, e.g., plaintiff's breach of contract claims under PERA should not be dismissed. In the end, plaintiff's counsel has done little to advance his clients cause.

deferral state within the meaning of 42 U.S.C. § 2000e–5."). Title VII also provides that where the alleged discriminatory practice has occurred in a deferral state, the deferral state has sixty days of exclusive jurisdiction over the claim. 42 U.S.C. § 2000e–5(c). *Trevino–Barton v. Pittsburgh Nat'l Bank,* 919 F.2d 874, 879 (3d Cir.1990).

However, Pennsylvania's Human Relations Commission ("PHRC") has, like many other similar state agencies, has entered into a worksharing agreement with the EEOC, pursuant to which the PHRC has waived its right to exclusive jurisdiction over discrimination cases during the sixty-day period. *Id.; Lantz,* 1996 WL 442795, at *2. The worksharing agreement between the EEOC and the PHRC expressly covers disability claims. *Melincoff,* 1998 WL 254971, at *10. The worksharing agreement waivers have been construed as self-executing and thus allow a plaintiff to proceed in court on a federal discrimination claim without first filing with the PHRC. *Woodson,* 109 F.3d at 926 ("Pennsylvania has waived its statutory right to initially process discrimination claims, and hence this agreement operates to 'terminate' the PHRC proceedings with respect to those complaints that are filed first with the EEOC.").

According to the Court of Appeals for the Third Circuit, however, a plaintiff may not rely on the operation of the worksharing agreement to satisfy the filing requirements of the PHRA and thereby initiate a PHRA claim. *Woodson,* 109 F.3d at 916. In *Woodson,* the plaintiff argued that he exhausted his administrative remedies on his PHRA claims because pursuant to the worksharing agreement, his charge was "automatically and simultaneously deemed filed" with the PHRC as soon as it was filed with the EEOC. 109 F.3d at 926. The Court of Appeals recognized that Pennsylvania courts have ruled that if the EEOC transmits the claim to the PHRC, the filing requirement of the PHRA has been satisfied. *Id.* at 926 n. 12. Nevertheless, the Court of Appeals held that "merely filing with the EEOC" is not suffi-cient to "initiate proceedings as required by state law" and, therefore, the plaintiff was time barred from asserting his PHRA claims. *Id.* at 926–27. The Court of Appeals noted, in this respect, that the result may have been different had the plaintiff marked the box for the EEOC to cross-file and the EEOC had failed to transmit the charge. *Id.* at 926 n. 12.

■ As in *Woodson,* Dubose did not mark the box for the EEOC to cross-file his claim with the PHRC. Moreover, despite the voluminous record provided by the Dubose, there is no evidence that Dubose ever filed a charge of discrimination with the PHRC or that his claim was actually cross filed. Because merely filing a charge with the EEOC is insufficient to institute a PHRA claim, Dubose is foreclosed from pursuing his PHRA claims due to his failure to exhaust his administrative remedies. *Woodson,* 109 F.3d at 926–27; *Melincoff,* 1998 WL 254971, at *10 (transmittal pursuant to worksharing agreement not dual filing for purposes of initiating PHRA claim); *Kepple v. GPU Inc.,* 2 F.Supp.2d 730, 739 (W.D.Pa.1998).

■ Next the Court must determine whether Dubose filed a timely EEOC charge and exhausted his administrative remedies with respect to his federal ADA claim against Temple. Temple first argues that because Dubose did not file a charge with the PHRC, the applicable limitations period is 180 days. However, in deferral states with worksharing agreements such as Pennsylvania, the 300 day filing period is available regardless of the state filing. *See, e.g., Office Prods.,* 486 U.S. at 124, 108 S.Ct. 1666; *Malone v. Specialty Products & Insulation Co.,* 85 F.Supp.2d 503, 505 (E.D.Pa.2000); *Bullock v. Balis & Co., Inc.,* 1999 WL 527792, at *3 (E.D.Pa. July 22, 1999); *Fosburg,* 1999 WL 124458, at *8; *Melincoff,* 1998 WL 254971, *11; *Cardoza v. Merion Cricket Club,* 1996 WL 653397, at *6 (E.D.Pa. May 2, 1996); *Brennan v. Nat'l Tel. Dir. Corp.,* 881 F.Supp. 986, 993 (E.D.Pa.1995); *see also Russell v. Delco Remy,* 51 F.3d 746,

750–51 (7th Cir.1995) (stating "[n]umerous courts have struggled with this issue and concluded, in different circumstances, that the provisions of various worksharing agreements operate to provide claimants with the benefit of the 300–day filing period"). Accordingly, the appropriate limitations period for Dubose's administrative claim is 300 days.[5]

█ Temple further argues that Dubose's claim must nevertheless be dismissed because the charge of discrimination was not filed until December 2, 1997, more than 350 days after he was terminated. (Temple Exh., Tab 43). In so doing, Temple argues that any visit or appointment that Dubose had with the EEOC prior to December 2, 1997, does not satisfy the requirement of filing a charge of discrimination. However, despite Temple's assertion to the contrary, Dubose not only visited the EEOC on July 10, 1997, but also filled out a "Charge Questionnaire" on that date. (Plt. Exh., Tab 8). The questionnaire identified Temple as a defendant, indicated that Dubose complained of discrimination based upon a disability and was signed by Dubose under oath. Moreover, the questionnaire itself states that "[w]hen this form constitutes the only timely written statement of allegations of employment discrimination, the Commission will, consistent with 29 C.F.R. § 1601.12(b) and 29 C.F.R. § 1626.8(b), consider it to be a sufficient charge of discrimination under the relevant statutes." (*Id.*, Tab 8 at n. 3). Thus, as the "only timely written statement of allegations," the Charge Questionnaire serves as the filing of a charge of discrimination. *See Bullock*, 1999 WL 527792, at *2 (discussing minimum requirements of charge); *Cf. Casavantes v. California State Univ.*, 732 F.2d 1441, 1443 (9th Cir.1984) (intake questionnaire sufficient to constitute charge).[6] Not only is the questionnaire a sufficient charge for purposes of the limitations period, but viewing the evidence in the light most favorable to Dubose, I find Dubose is entitled to a tolling of the limitations period as of the date he completed a "Charge Questionnaire." *Bidic v. The Prudential Ins. Co.*, 1987 WL 7838, at *4 (D.N.J. Jan.20, 1987) (where formal charge not filed until after 300 day limit, statute of limitations equitably tolled as of the date of plaintiff's filing an "Intake Questionnaire" with the EEOC). Because Dubose filled out the questionnaire within 300 days of his termination, this Court rejects Temple's argument Dubose's ADA claim is time barred.[7]

5. Dubose admits receiving a letter notifying him he had been terminated no later than December 11, 1996. This marks the date from which the limitations period began to run because as of his termination, Dubose had all the facts upon which his claim of discrimination is based. *Delaware State College v. Ricks*, 449 U.S. 250, 258–59, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1385–1388 (3d Cir.1994) (date of injury begins limitations period, not when plaintiff realized injury constituted a legal wrong). The fact that Dubose sought to grieve his termination does not toll the running of the limitations period. *Ricks*, 449 U.S. at 261, 101 S.Ct. 498 ("the pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations periods").

6. A number of courts have criticized the notion that an Intake Questionnaire can serve as an administrative charge. *See, e.g., Early v. Bankers Life & Casualty Co.*, 959 F.2d 75, 80–81 (7th Cir.1992); *Peterson v. City of Wichita*, 706 F.Supp. 766, 774–75 (D.Kan.1989); *Proffit v. Keycom Elec. Publ.*, 625 F.Supp. 400, 403 (N.D.Ill.1985). A major criticism of treating an intake questionnaire as a formal charge is that doing so contravenes the statutory requirement that a charge be made under oath. These cases are, however, inapposite. First, the Court is not considering an Intake Questionnaire but rather a Charge Questionnaire which by its very terms is treated as a charge by the EEOC in the absence of a formal charge. Second, Dubose clearly signed the Charge Questionnaire under oath.

7. This conclusion is buttressed by the fact that the EEOC issued a right to sue letter without indicating that the claim was time barred. (Temple Exh., Tab 49). The EEOC may close a file "because [the charge] was not filed within the time limit required by law." (*See* Temple Exh., Tab 45).

## B. The Americans with Disabilities Act

The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that individual holds or desires." *Id.* § 12111(8).

■ As with cases brought under Title VII and the ADEA, it is permissible in an ADA case for a plaintiff to prove discrimination on the part of an employer through the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and its progeny. To establish a prima facie case under the ADA, a plaintiff must demonstrate that: (1) he or she is a disabled person within the meaning of the ADA; (2) he or she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he or she has suffered an otherwise adverse employment decision as a result of discrimination. *Gaul v. Lucent Tech., Inc.*, 134 F.3d 576, 580 (3d Cir.1998) (citing *Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir.1996)).

■ A "qualified individual with a disability," is one who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *McCoy v. Pennsylvania Power & Light Co.*, 933 F.Supp. 438, 440 (M.D.Pa.1996) (quoting 42 U.S.C. § 12111(8)). A person unable to work is not intended to be, and is not, covered by the ADA. *McNemar v. Disney Store, Inc.*, 91 F.3d 610, 618 (3d Cir.1996). Likewise, temporary disabilities or non-chronic impairments of short duration are not generally considered disabilities under the ADA. *Nave v. Wooldridge Constr.*, 1997 WL 379174, *4 (E.D.Pa.1997).

Temple argues that Dubose is not a disabled person within the meaning of the ADA. A person is considered to be disabled within the meaning of the ADA if he or she: (1) has a physical or mental impairment that substantially limits one or more of the major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment. 42 U.S.C. § 12102(2)(A)-(C); 29 C.F.R. § 1630.2(g); *Presta v. SEPTA*, 1998 WL 310735, at *5 (E.D.Pa.1998). "Substantially limits" means either the individual is unable to perform a major life activity, or, the individual is "significantly restricted as to the condition, manner or duration" under which he can perform the major life activity, when compared to the abilities of the average person in the general population. 29 C.F.R. § 1630.2(j)(1); *see Kelly v. Drexel Univ.*, 94 F.3d 102 (3d Cir.1996) (ruling plaintiff who walked slowly and used handrail when climbing stairs is not substantially limited in the major activity of walking). The following factors should be considered in determining whether an individual is substantially limited in a major life activity: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2); *Panzullo v. Modell's Pa.*, 968 F.Supp. 1022, 1023–24 (E.D.Pa.1997).

For the major life activity of working to be substantially limited, the plaintiff must be "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various clases as compared to the average person having comparable training, skills, and abilities." 29 C.F.R. § 1630.2(j)(3)(I); *Olson v. General Electric Astrospace*, 101 F.3d 947, 952 (3d Cir.1996). A "class of jobs" includes "jobs utilizing similar training, knowledge, skills or abilities, within that geographical area," while a "broad range of jobs in various

classes" includes "jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment." *Panzullo*, 968 F.Supp. at 1023–24 (quoting 29 C.F.R. § 1630.2(j)(3)(ii)(B), (C)). However, the inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working. 29 C.F.R. § 1630.2(j)(3)(i).

■ Applying these principals to Dubose's alleged disabilities, this Court concludes that Dubose is not disabled within the meaning of the ADA. Dubose claims that he has both a physical and a mental impairment which substantially limits his ability to engage in the major life function of working. With respect to his physical limitation, the record does not support Dubose's contention that the injury to his wrist has substantially limited his ability to work. On the contrary, the record reflects that he continued to be employed in the same capacity at Temple for over four years after his initial injury and for more than two years after re-injuring his wrist. Thus, his physical impairment did not prevent him from carrying out his job duties while at Temple. Moreover, despite Du-

bose's contention that he was unable to complete job assignments, there is no evidence that Temple was dissatisfied with his ability to do the work assigned to him. *See Howell v. Sam's Club No. 8160/Wal–Mart*, 959 F.Supp. 260, 266 (E.D.Pa.1997), *aff'd*, 141 F.3d 1153 (3d Cir.1998). "Even a medically documented, moderate lifting restriction is not sufficient to withstand summary judgment if the employee cannot demonstrate how the lifting restriction substantially limits his or her ability to engage in the major life activity of working." *Id.* at 267 n. 10.[8] In addition, unlike a back injury or non-orthopedic condition such as a heart disease which results in a lifting restriction, Dubose is only restricted from lifting heavy objects with one hand.[9] More importantly, Dubose has not shown that his physical impairment significantly restricts his ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities. *Id.* at 267; *Nave v. Wooldridge Construction*, 1997 WL 379174, at *5–*6 (E.D.Pa. June 30, 1997). In sum, there is no evidence to support Dubose's claim that his physical impairment substantially limited his ability to work.[10]

**8.** I note that the record does not support a finding of a fifteen pound lifting restriction between late 1993 and 1996. In July of 1993, Dubose's doctor wrote in his notes that Dubose could return to work with a lifting restriction of fifteen pounds but that he would be re-evaluated in three weeks. Although there is evidence that the cause of Dubose's discomfort was a ganglion, and that if the pain persisted an operation may be necessary, there is no evidence that Dubose was ever operated on or that his condition deteriorated. On the contrary, the only evidence in the record is that Dubose's condition improved. By Dubose's own account as it appears on an EEOC intake questionnaire dated June 5, 1998, Dubose wrote that "I was able to do my job with the accomodation [sic] of not lifting more than 29 lbs." (Union Mot., Exh. B at D00441). This is consistent with the prior medical record insofar as Dubose's condition did improve over time after the original injury in 1992. Although I must consider the record in the light most favorable to the non-moving party, I cannot ignore the record. Despite that fact that Dubose reiterates that his doctor

initially limited his ability to lift to fifteen pounds, inferring thereby that it has remained at 15 pounds, he offers no explanation of his subsequent declaration that his weight restriction on lifting was twenty-nine pounds. I therefore take him at his word that his lifting restriction prior to being terminated was 29 pounds.

**9.** Although Dubose does not argue that he is substantially limited in his ability to engage in the major life function of lifting, the evidentiary record does not support a finding that Dubose is so limited. Dubose has therefore failed to meet his to meet his burden of demonstrating that he is substantially limited in his ability to engage in the major life function of lifting.

**10.** Moreover, there is no evidence that Dubose was terminated because of his physical limitation. Therefore, even assuming that his physical impairment was a disability within the meaning of the ADA, Dubose has not come forward with any evidence that the legitimate, non-discriminatory reason given for

Dubose also argues, however, that due to his mental breakdown he is disabled within the meaning of the ADA. Dubose was diagnosed as suffering from "Major Depression Single Episode." (Union Mot., Exh. C at 26; Exh. D at 000098.) Dubose was treated at Mt. Sinai Hospital on an outpatient basis. Dubose was prescribed antidepressant medication and continued treatment, at least intermittently until July 1997. During the course of his treatment, his physician, Dr. Yeroushalmi, noted in his patient file that Dubose's "mental status has improved remarkably."[11] (Id., Exh. C at 43; Exh. D at 000123). Indeed, there is no allegation that Dubose suffers from a permanent mental disability or that his disability is of unknown duration. Moreover, at his deposition, Dubose's own doctor specifically expressed his opinion that Dubose's mental condition was not chronic.[12] (Id., Exh. C at 52). Finally, there is no evidence that Dubose continues to suffer any effects from his depressive episode. Nave, 1997 WL 379174, at *7 (current employment and condition is relevant to show whether condition was permanent). Any mental impairment is therefore non-chronic and of a temporary nature which does not qualify as a disability. 29 C.F.R. § 1630.2(j) ("temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities"); Shannon v. City of Philadelphia, 1999 WL 1065210, at *3–*4 (E.D.Pa. Nov.23, 1999); Nave, 1997 WL 379174, at *7. Moreover, even if Dubose had produced any evidence that his mental disability was anything other than temporary, he has failed to show that his mental impairment significantly restricts his ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. Howell, 959 F.Supp. at 267; Nave, 1997 WL 379174, at *5–*6 (E.D.Pa. June 30, 1997). Summary judgement is therefore appropriate.[13]

Dubose has also brought claims of discrimination in violation of the ADA against the Union. Because Dubose is not disabled for purposes of the statute, his claim against the Union must also fail.[14]

his termination was pretextual. Eible v. Houston, 1998 WL 303692, at *4 (E.D.Pa. April 21, 1998), aff'd, 187 F.3d 625 (3d Cir. 1999).

11. Dr. Yeroushalmi further noted that Dubose "has continued to be very demanding and manipulative. He doesn't show any interest and motivation to return to work. . . . He is unrealistic about medical leave and wanted to extend it beyond reasonable medical excuse." (Union Mot., Exh. C at 43; Exh. D at 000123.)

12. Dr. Yeroushalmi further testified that he thought Dubose was being manipulative because on the one hand Dubose was claiming to be fine but on the other that he was still anxious and could not return to work. (Union Mot., Exh. C at 43). In short, Dr. Yeroushalmi testified that "we felt that he was not genuine about what he was reporting and being really sick about what the work is about." (Id. at 44).

13. Because Dubose is not disabled within the meaning of the ADA, I do not reach the issue of whether Temple failed to accommodate Dubose or had notice of his disability. Therefore, any references Dubose made to his claim for disability benefits—which he relied upon to show that Temple had notice of his alleged disability—had no impact on the resolution of this motion for summary judgment. Thus, the motion of the Union to strike these references for failure to comply with discovery obligations will be dismissed as moot. I recognize that plaintiff's counsel has been dilatory in the past with respect to his discovery obligations and that the Union's frustration with such tactics may be justified. However, because there has been no prejudice, sanctions are not warranted now.

14. Even if this were not the case, the grounds for Dubose's ADA claim against the Union are unclear. Dubose's factual allegations against the Union pertain solely to the failure of the Union to file a timely grievance on behalf of Dubose. There is no allegation that the Union caused Temple to terminate Dubose or otherwise caused Temple to discriminate against Dubose. Nor is there any allegation that the Union failed or refused to make a reasonable accommodation in the course of its representation. Finally, there no any evidence that the Union treated Dubose less favorably on account of his alleged disabilities than the Union treated similarly situated members who are not disabled. Indeed, there is no evidence connecting the Union's

## C. *Remaining State Law Claims*

Dubose also asserts claims of negligence, breach of contract and bad faith under the Pennsylvania Public Employment Relations Act, ("PERA"), 43 P.S. § 1101.101 et seq., as well as a claim for "fraud/misrepresentation." It is undisputed that Temple is a public sector employer and that Dubose is a public employee. Therefore, the remaining claims against the Union arising out of its representation of Dubose are governed by Pennsylvania labor law, not federal law. *Jackson v. Temple Univ.*, 721 F.2d 931, 933 (3d Cir. 1983); *Philadelphia Ass'n of Interns & Residents v. Albert Einstein Medical Center*, 470 Pa. 562, 369 A.2d 711, 713–14 (1976).

 Under PERA, an aggrieved public employee's sole remedy in the courts when a union has breached its duty of fair representation by acting in bad faith, is an action in equity to compel arbitration. *Martino v. Transp. Workers Union, Local 234*, 505 Pa. 391, 480 A.2d 242, 252 (1984); *Waklet–Riker v. Sayre Area Educ. Ass'n*, 440 Pa.Super. 494, 656 A.2d 138, 141 (1995); *Speer v. Philadelphia Housing Auth.*, 111 Pa.Cmwlth. 91, 533 A.2d 504, 506 (1987). Accordingly, under Pennsylvania law, there is no cause of action for breach of contract against a union in connection with its representation of an employee. *Waklet–Riker*, 656 A.2d at 141 (trial court correctly dismissed claim for breach of contract because such a claim is not cognizable under PERA). Nor can a union be held liable for negligence in processing or failing to process a grievance. *Id.* at 141 ("a public employee's union can be held liable to its members only for acts of bad faith, and not for negligence in processing a grievance"). Similarly, employees of public institutions cannot sue their employer for breach of contract damages. *Martino*, 480 A.2d at 252; *Ziccardi v. Commonwealth of Pennsylvania*, 500 Pa. 326, 456 A.2d 979, 980–81 (1982) ("an employee has no right to sue his employer in equity and assumpsit for wrongful discharge where his union has refused to proceed to arbitration"); *Runski v. Am. Fed'n of State County & Mun. Employees*, 142 Pa.Cmwlth. 662, 598 A.2d 347, 350 (1991), *aff'd*, 537 Pa. 193, 642 A.2d 466 (1994). Thus, the defendants are entitled to judgment as a matter of law on Dubose's breach of contract and negligence claims, which he asserts under PERA. In addition, because a breach of the Union's duty of fair representation claim is Dubose's sole cause of action arising from the Union's alleged failure to represent him, the defendants are entitled to judgment as a matter of law on Dubose's common law claims for "fraud/misrepresentation."

 However, despite the fact that Dubose has inartfully pled causes of action which are unavailable to him under PERA, the Court will interpret the complaint, consistent with the factual allegations therein, as pleading a breach of the Union's duty of fair representation ("DFR") claim. In general, an employer may be joined in such an action when joinder is necessary to afford an employee an adequate remedy and ensure compliance with PERA's requirement of mandatory arbitration. *See, e.g., Pennsylvania Soc. Serv. Union v. Lynn*, 677 A.2d 371, 374 (Pa.Cmwlth.1996) (where union breaches duty of fair representation by failing to pursue wrongful discharge action, employer approaches status of indispensable party because dispute cannot be finally resolved without its participation); *Runski*, 598 A.2d at 350. The only exception to the limitation on an aggrieved public employee's available remedies is where the employee can show by specific facts that the employer actively participated in the union's bad faith or conspired with the union to deny the employee his rights under the collective bargaining agreement. *Id.; Waklet–Riker*,

---

alleged mishandling of Dubose's grievance with his alleged disability in any way. Thus, summary judgement is appropriate with re-

spect to Dubose's claim that the Union discriminated against him in violation of the ADA.

656 A.2d at 141. Under such circumstances, a court may award an aggrieved employee damages. *Id.*

■ Dubose argues that Temple conspired with the Union to deny him his rights under the collective bargaining agreement and, therefore, he is entitled to damages. Dubose does not, however, offer any evidence to substantiate his conspiracy theory. As evidence of a conspiracy, Dubose points to the fact that Temple agreed to hold what he characterizes as a mock grievance hearing. However, the fact that Fields continually misrepresented to Dubose that she had filed a grievance and that the meeting with Temple was a grievance hearing is not evidence that Temple conspired with the Union to mislead Dubose or that the hearing was a sham designed to deprive Dubose of his rights. On the contrary, by Dubose's own account, it was only after Temple inquired why no grievance had been filed that Dubose learned that the Union had not filed a grievance and had potentially breached its duty of fair representation. Temple's conduct belies Dubose's assertion that Temple was conspiring with the Union to mislead Dubose into believing that a grievance had been filed or that the meeting was a grievance hearing as opposed to a extraordinary opportunity to make his case despite that fact that a grievance had not been filed. In sum, Dubose has presented no evidence from which a reasonable juror could conclude that Temple conspired with the Union to deprived Dubose of his rights under the collective bargaining agreement. *See Runski,* 598 A.2d at 351 (conclusory allegations do not satisfy requirement that employee, to recover damages, must show by specific facts that employer actively participated in the Union's bad faith or conspired to deny employee's rights under collective bargaining agreement). Therefore, Dubose's only remedy is an order compelling arbitration.

■ The Union argues, however, that because Temple did not violate the collective bargaining agreement when it terminated Dubose, his DFR claim must fail. The Union premises its argument on the assumption that a DFR claim under PERA should be treated that same as a hybrid "section 301/duty of fair representation" claim under federal law. *DelCostello v. Int'l Bhd. of Teamsters,* 462 U.S. 151, 164–165, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983); *Felice v. Sever,* 985 F.2d 1221, 1226 (3d Cir.1993). In so doing, the Union notes that Pennsylvania courts look to federal decisions for guidance where there is no meaningful difference between the established policies of the PERA and federal labor laws. *See, e.g., Burse v. Commonwealth, Pennsylvania Labor Relations Bd.,* 56 Pa.Cmwlth. 555, 425 A.2d 1182, 1184 (1981). Under federal law, to prevail against a union on under a hybrid DFR claim, the aggrieved employee must not only prove a breach of duty by the union but also that the employer breached the collective bargaining agreement. *DelCostello,* 462 U.S. at 164–165.

■ The Pennsylvania Supreme Court, however, has already considered the relevance of federal law with respect to a union's breach of its duty of fair representation, concluding that "[w]hile the federal cases ... interpreting the rights of employees to sue their unions and employers under [federal law] are instructive, they are not authoritative on cases arising under PERA." *Martino,* 480 A.2d at 249.[15]

---

15. Indeed, there are meaningful differences between a DFR claim under PERA and a federal hybrid "section 301/duty of fair representation" claim. For example, as a general rule, the only remedy available to a public employee bringing a DFR claim under PERA is equitable relief. *See, e.g., Martino,* 480 A.2d at 249–50; *Ziccardi,* 456 A.2d at 981–82. In contrast, damages are available to an aggrieved employee bringing a hybrid federal cause of action. *Chauffeurs, Teamsters &* *Helpers, Local No. 391 v. Terry,* 494 U.S. 558, 564, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990) ("Whether the employee sues both the labor union and the employer or only one of those entities, he must prove the same two facts to recover money damages: that the employer's action violated the terms of the collective-bargaining agreement and that the union breached its duty of fair representation."). In addition, an aggrieved employee bringing a federal hybrid section 301/duty of fair representation claim may be entitled to a trial by

More specifically, Pennsylvania courts have not made an aggrieved employee's DFR claim under PERA contingent upon proving that the employer breached the collective bargaining agreement. *Martino*, 480 A.2d at 251 (if employee establishes union's breach of its duty of fair representation, court may order arbitration); *Ziccardi*, 456 A.2d at 980–81 (evidence of breach not required to establish union's liability). In *Ziccardi*, the plaintiff sued her union for breach of its duty of fair representation and her employer for wrongful termination, without just cause, in violation of the collective bargaining agreement. *Id.* at 980. The Pennsylvania Supreme Court dismissed the wrongful termination claims against the employer and in so doing, explained that the issue of just cause *does not* determine liability for a union's breach of its duty of fair representation. *Id.* at 981. The issue of just cause, according to the Court, is relevant to the issue of damages, not liability. *Id.* Therefore, unlike a hybrid DFR claim for damages under federal law, to be entitled to equitable relief, there is no requirement under PERA that an aggrieved employee prove that he was discharged in violation of the collective bargaining agreement. *Id.*; *Hughes v. Council 13, Am. Fed'n of State, County & Mun. Employees*, 157 Pa. Cmwlth. 96, 629 A.2d 194, 195–96 (1993), *aff'd*, 536 Pa. 539, 640 A.2d 410 (1994). To be entitled to equitable relief, the aggrieved employee must only prove that the Union acted in bad faith. *Martino*, 480 A.2d at 252. Because the undisputed evidence demonstrates that the union acted in bad faith and breached its duty of fair representation, an Order compelling arbitration of the underlying grievance is appropriate.

Temple, however, argues that although Dubose's remedy is limited to an Order compelling arbitration of the underlying grievance, in this instance his claim should be dismissed with prejudice and this Court should not enter an Order compel-

ling arbitration. Temple bases its argument on the fact that Dubose has not requested equitable relief, that he has waived his right to demand arbitration and that requiring arbitration could result in inconsistent results. First, I am not persuaded that Dubose has waived his right to have this matter arbitrated either because of the ineptitude of his counsel or by not demanding arbitration himself when the union failed to do so on his behalf. *Martino*, 480 A.2d at 243–44 (employer can be joined and court may fashion "an appropriate equitable remedy which would permit grievance arbitration *nunc pro tunc*"). Second, because I have determined that Dubose did not suffer from a disability within the meaning of the ADA, I have not reached the merits of Dubose's claim insofar as pertains to Temple's conduct regarding his termination. Thus, the concern over inconsistent results is inconsequential and cannot serve to preclude arbitration.

Finally, Temple argues that—should this Court order that the underlying grievance be submitted to arbitration—it is entitled to an Order that the Union must indemnify Temple because it did not breach the collective bargaining agreement and wrongfully discharge Dubose. Temple's argument would require a determination by this Court that it did not wrongfully discharge Dubose. However, because the remedial power of this Court in cases governed by Pennsylvania's labor laws is limited to ordering the completion of the arbitration process, an employer's liability for wrongful discharge, if any, is determined by the arbitrator. *Martino*, 480 A.2d at 252 (it is for the arbitrator "to determine whether or not the complainant was wrongfully discharged"). Furthermore, under Pennsylvania law, damages for a DFR claim are apportioned between the employer and the union. *Id.* Because it is left to the arbitrator to determine whether Dubose was wrongfully discharged and to apportion damages ap-

propriately, the Court will deny Temple's request for an order that the Union indemnify Temple.

 It is worth noting, however, that the Pennsylvania Supreme Court has explained that if an arbitrator concludes that back pay is warranted, the employer's liability for back pay is limited to the period from the date of wrongful termination to the date when arbitration would normally have commenced. *Martino,* 480 A.2d at 251. In so doing, the Court reasoned that in the absence of an apportionment providing meaningful sanctions against the union, there would be little incentive to comply with the grievance procedures. In addition, the Court recommended that an Order compelling arbitration should be coupled "with an order imposing liability on the union for any *additional damages* suffered by the employee if it should be found in arbitration that the grievance was justified." *Martino,* 480 A.2d at 251 n. 15.

## V. Conclusion

Based upon the foregoing, I will grant the motions in part and deny the motions in part and Order compulsory arbitration. Because joinder of Temple as the employer is necessary for the full and fair resolution of the underlying grievance, Temple will remain a party to the arbitration. An appropriate Order follows.